[Criminal No. 663.  Filed March 19, 1928.]

[265 Pac. 609.]

# B. W. L. SAM, Appellant, v. STATE, Respondent.

384

Mr. L. L. Wallace and Messrs. Struckmeyer, Jennings & Strouss, for Appellant.

Mr. John W. Murphy, Attorney General, Mr. Frank J. Duffy, Assistant Attorney General, and Mr. J. Hubert Smith, County Attorney (Mr. W. E. Patterson and Mr. J. J. Sweeney, of Counsel), for the State.

LOCKWOOD, J.—B. W. L. Sam, Shew Chin, Gee King Long, Jew Har and Wong Lung were jointly informed against by the county attorney of Mohave county for the crime of murder. They entered pleas of not guilty, and B. W. L. Sam and Shew Chin were each tried separately, the other defendants being tried jointly before a third jury. In each case a verdict of guilty of murder in the first degree

was returned, and the death penalty was fixed for all of the defendants. They were each duly sentenced to be hanged, and have appealed to this court.

There were three separate appeals filed, that of *B. W. L. Sam* v. *State, post,* p. 421, 265 Pac. 622, that of *Shew Chin* v. *State, post,* p. 419, 265 Pac. 621, and that of *Gee King Long, Jew Har and Wong Lung* v. *State, post,* p. 420, 265 Pac. 622; but since the proceedings in each of the three cases were almost identical and since the assignments of error in the first named cover every assignment made and issue raised in the subsequent ones, by agreement of counsel the three cases were briefed and argued together, it being admitted that if the judgment against B. W. L. Sam is affirmed the others must take the same course, although the converse does not necessarily follow, as there are one or two alleged errors occurring at the trial of Sam which do not appear in the other cases, or at least the grounds in support thereof are not so strong. Before considering the various assignments of error, we think it best to make a statement of the facts in the case. No evidence was offered on behalf of defendants, so that we must consider the matter solely in the light of the testimony of the state's witnesses.

It appears therefrom that one Tom King, a Chinese, owned and operated a restaurant in Kingman, Mohave county, Arizona, known as the Mohave Cafe. This restaurant fronted on the main street of Kingman, and at its rear was an alley that ran at right angles to the back door, connecting with streets at each end. On the night of October 20, 1926, between 8:30 and 9 P. M., Tom King had finished his day's work, and was sitting in the kitchen by the rear door of the cafe, smoking his pipe. He was carrying on a conversation with another Chinese who lived in Mineral Park, Arizona, by the name of Wong Chong. A partner of Tom King, a Chinese

named Don On, and an American named Frank Craig, who worked for them, were also in the kitchen, while one Chan Cheung was in the front dining-room taking the cash out of the cash register. According to the testimony of Don On, taken at the preliminary examination of all the defendants, while Tom King was carrying on this conversation, footsteps were heard in the rear of the cafe, and three Chinese entered the door by which Tom King was sitting. A fourth Chinese stood at the door holding the screen open. One, whose name was later ascertained to be Gee King Long, stepped in front of Tom King, and said "Hello, Tom King," in Chinese. As soon as this remark was made the other two Chinese, whose names were later ascertained to be Jew Har and Wong Lung, stepped up to either side of Tom King and began shooting at him. He rose from his chair and fell forward, whereupon the three Chinese gathered about him and one shot him in the head. When this was done, these three and the one holding open the screen rushed out through the back door of the cafe.

Immediately thereafter, according to the testimony of Ben Stromer, a resident of Kingman, a Chrysler automobile came out of the alley behind the cafe, and, after nearly colliding with the car driven by Stromer, disappeared in the direction of the post-office. He noticed that the car carried a California license plate with the letter "D" upon it, and that the rear curtains were up, and afterwards identified it as the one found by the sheriff's deputies at the Sacramento Wash. Immediately after the killing Fred Coheneur, a deputy sheriff of Mohave county went into the restaurant and found Tom King lying dead on the floor. The room still contained some powder smoke, and the smell of powder was very plain. He met Don On and asked what the trouble was, and the latter replied that three Chinese had

done the killing, and that they went out the back door and got in a car in the alley, this statement being made within a very few minutes of the killing, as shown by the fact that the room was still full of powder smoke.

Sheriff Mahoney was notified immediately, and Stromer informed Coheneur that he had seen this Chrysler car come out of the alley. All the deputies in the various towns of Mohave county accessible by telephone were immediately notified of the killing and instructed to stop and search all automobiles and arrest any Chinese found therein, and particularly to block the bridge across the Colorado River at Topock. Along about 2 o'clock in the morning a Buick automobile drove up to Topock, coming from the direction of Kingman, and heading towards Needles. The officers stopped it and found it was occupied by several Americans in front and the five defendants in the rear. The deputies inquired of the driver where he had picked up defendants, and was informed that their car had broken down between Topock and Yucca in the Sacramento Wash, and they had requested him to take them to San Bernardino. One of the deputies then asked the Chinese where they had come from that night, to which Wong Lung replied that they had come from Williams, Arizona. The latter was then questioned as to the time they came through Kingman, to which he answered that they did not come through Kingman, and to the inquiry as to how they could get from Williams to Topock without coming through Kingman no reply was made. The Chinese were then ordered to leave the automobile, and they demurred, stating they were going to San Bernardino where their father was dying; but upon the insistence of the officers finally alighted and one of them requested leave to send a telegram, but was told he would have to get permission from the court in King-

man the next morning. The deputies then took defendants back to Kingman, and on the way found a Chrysler car abandoned in the Sacramento Wash about twelve miles east of Topock, and headed towards California. Defendants were searched, and Wong Lung was found to be carrying tire lugs and keys which fitted the Chrysler automobile, and various papers in Chinese and English were found on defendant Shew Chin. Wong Lung admitted that the Chrysler automobile belonged to defendants.

There was evidence introduced at the trial that a certain Chinese had frequently interviewed defendants while they were in jail during the months of November and December, and before their trial, and had attempted to bribe one of the state's witnesses to testify to an alibi for them. It was also shown that during the months of October and November, 1926, a tong war was going on in some of the western states between the Hop Sing tong and the Bing Kong tong. One of the documents found in the possession of Shew Chin was a receipt issued by the Bing Kong tong, while a receipt from the Hop Sing tong was found among the effects of Tom King, the deceased. It further appeared that some of the defendants had passed the night of October 19th in Needles, California, that the Chrysler car was seen to pass through Yucca going towards Kingman late in the afternoon of October 20th, and that it arrived in Kingman a few minutes before the shooting on the night of October 20th, its occupants being identified by different witnesses. Two pistols were found in a garbage can in the rear of the cafe on the morning after the murder.

The defendants were given a preliminary examination on the 27th of October, in the justice court of Kingman precinct. At this time they were represented by Mr. L. L. Wallace, of Kingman. The testimony given at the inquest was taken by Mr.

J. T. Morgan, who was the official court reporter of the superior court of Mohave county, and was by him reduced to writing and filed in the superior court. The defendants were then removed for safe-keeping to the Yavapai county jail in Prescott, Arizona. On the 27th of November the defendants were arraigned before Honorable E. ELMO BOLLINGER, judge of the superior court of Mohave county, being represented as at the preliminary examination by Mr. L. L. Wallace. The information was duly read to them, and their counsel asked for a few days in which to enter their pleas, as he had not had an opportunity to study the record and the information. The court asked counsel if it would make any difference to him if the pleas were received a few days before the jury session was set, to which the latter replied that it would not, and the court, after again consulting him, fixed Friday, December 10th, as the date of the pleas, and further informed defendants in the presence of their counsel that they would be required to go to trial, in all probability, on the fifteenth day of December. The court then asked counsel for defendants whether he would ask for a delay of the setting at the time of the plea, to which he replied that it would depend upon what developed after he had examined the record.

On the tenth day of December defendants and their counsel appeared for a plea and presented a motion to set aside the information on the ground that prior to the filing thereof the defendants had never been legally committed by a magistrate, the point being made that it did not appear affirmatively that the examining magistrate had appointed a stenographer, nor had the testimony been reduced to writing by the magistrate or under his direction, and signed by the witnesses and certified by the magistrate, as provided by section 881, Penal Code of 1913. After considerable discussion and argument the court over-

ruled the motions on the ground that the law had been substantially complied with, and if there were any irregularities they had been waived by the participation of the defendants and their counsel, whereupon demurrers to the information were prepared and filed, and the same point was urged. The demurrers being overruled by the court, pleas of not guilty were entered in due form. The court then inquired as to whether counsel for defendants had any preference as to the date of trial, whereupon the latter replied that he was busy in the trial of another case, that it would be necessary to take the depositions of some witnesses in San Francisco or arrange for their presence, and that he would not have time to present the case properly before the next jury term, and asked that they go over until then. The court then stated that the cases would be set down for trial December 16th. It was agreed that B. W. L. Sam should be tried first, Shew Chin second, and the case of Gee King Long, Jew Har and Wong Lung was to follow immediately.

On December 16th, defendants being present in court in person and by their counsel, on an inquiry by the court as to whether the parties were ready, the state announced ready, but the defendants' counsel filed a motion for a continuance and stated as follows:

"In addition to that, may it please your honor, I would state that I would also be willing to file a supplemental affidavit, incorporating this in the affidavit, that in my endeavors to have the trial at this time I have worked night and day, and I know the limit of my endurance, my physical endurance, and I feel that I could not try a case at this time, even though I were prepared. A human being can go so far and then he breaks. I have been sick for two days and I know that I could not try this case with justice and fairness to my client; and ever since the day that I was employed by them I have devoted every minute of my time that I possibly could, and

after the setting for the pleas was entered I have laid aside everything, and, as I say, worked night and day until I am in such physical condition at this time that I tell the court frankly that I would not want a lawyer in the physical condition I am in at this time to try my case. I have gone on my nerve the last two days.''

The grounds for the continuance contained in the motion and supported by affidavit were, substantially, that counsel had not had time properly to prepare the case and interview witnesses for the defense, and, further, that the presence of a certain witness, to wit, one Wong Chong, could not be obtained in time; that said witness, if present, would testify that he saw the shooting, and that none of the defendants were present, and that other persons committed the crime, and that if the case were continued until the next jury term the witness would be present. The county attorney resisted the motion, alleging the preliminary examination was held October 27th, and that counsel for defendants had been employed in the case ever since that time, to which the latter replied that he represented the defendants in the preliminary examination but his services had then ceased. The court then denied the motion and ordered the trial to proceed, directing the clerk to draw the names of twenty-nine jurors. Immediately thereafter counsel asked for a moment's indulgence, stating that he had a document which he wished to have his client sign, but the court proceeded with the call of the jurors, and after two had been called, counsel for defendant filed with the clerk affidavits under section 999, Penal Code of 1913, alleging bias and prejudice on the part of the presiding judge. The remaining 27 jurors were called into the box, and the court ordered them to be sworn. Counsel for defendants then filed a challenge to the panel, which was based upon several grounds, which we shall de-

scribe more particularly in the discussion of the assignments of error. No exception to or denial of the challenge was made by the county attorney, but the court immediately denied the challenge and the jury was sworn as to their qualifications, and thereafter citations were issued for the signers of the supporting affidavits of bias and prejudice to appear before the court. Shortly after the noon recess two of these parties were present, and upon examination it appeared that they had signed affidavits in support of the affidavit of bias and prejudice filed by defendant Sam while the jury was in the process of being drawn. The affidavits were in statutory form, and the persons signing them were qualified to do so. Both of them, however, stated that they had never sworn to the affidavits nor had they read them, nor did they know their contents except they were told that they were filed for the purpose of causing a continuance of the trial. The court then made the following statement:

"The court will have to rule that the affidavits, in the manner they were secured, and the manner in which they are drawn, are insufficient under the law; furthermore, that the affidavit of the defendant was never taken; he signed the paper after the trial was started, and both affidavits were filed after the trial was started and jurymen in the box; that the Supreme Court decisions in this state hold that that is too late to file such an affidavit, and I am willing to stand upon that record. I would like to say to you, Mr. Wallace, that if you intend to pursue these tactics in these cases, I have anticipated it and I have arranged with one of the superior judges of this state to come here; and he is a man who, I believe, in the last four years has tried more criminal cases than any one judge in the state, and I am sure that he will be fair and impartial, because everybody looks alike to him. And when we get to the next case, if you want to comply with the law and file sufficient affidavits before the trial starts, I will take charge of department 1 of the superior court

in Phoenix and Judge Phelps will be here; or if you prefer some other judge, if you will disqualify me, I will get you any other judge in the state that is available. But these cases are going to be tried, each and every one of them. If this court has to run day and night between now and the first of the year, these cases are going to be tried. Mr. Blakely goes out of the office of the county attorney and takes this position; he will be disqualified to hear the cases next year. Mr. Hubert Smith is in your office, associated with you in the practice of law; he will be the county attorney. And these cases naturally come up in my term of office. This offense occurred in October. It has been delayed at the request of both of you, to suit the convenience of both you and Mr. Blakely. I have here more than 60 men, costing the county more than $225 a day; I have an interpreter here from Los Angeles at a heavy expense; and the cases are going to be tried, as far as my discretion goes, whether I try them or some other judge tries them. All of the defendants may look for that. And if counsel needs help to try the cases, he can get help. If counsel wants to withdraw, I will give him a chance to get counsel or appoint counsel for them. I want to give the defendants a fair and impartial trial, but the state of Arizona is interested in this case. They are all going to be tried, and let us proceed on that theory from now on.''

The trial then went on in the usual manner.

No serious question arose until there was an attempt to translate certain of the documents found on the defendant Shew Chin. It appeared that the court had brought from Los Angeles for the purpose of acting as interpreter in the cases one Roy Lim, and when one of these documents containing Chinese writing was offered to him, he said that he was unable to translate part of it. The county attorney then stated that there was a man present in court who was able to make the translation, whereupon one Wong Chong was duly sworn as interpreter, over the objections of counsel for defendants that

he was not qualified, and the two interpreters, acting together, proceeded to make an interpretation of the document in question.

The next serious objection that arose was when the state attempted to offer the testimony of Don On taken at the preliminary examination. The defendant's counsel objected most strenuously thereto, and W. P. Mahoney, sheriff of Mohave county, and D. F. Meredith, a deputy sheriff, were called as witnesses to make the showing necessary for the admission of the testimony, and the sheriff's return on a subpoena for Don On was also presented. On these the court ruled that the testimony taken at the preliminary would be admitted. We shall discuss the sufficiency of the showing when we consider the assignments of error.

The next and last objection of importance made was when the state offered to show by the witness Oker that during the month of October, 1926, there was a tong war going on between the Bing Kong tong and the Hop Sing tong, and that that condition existed on the twentieth day of October, 1926, at the time of the killing.

The foregoing gives the various proceedings from the time of the killing up to and including the trial, and the evidence submitted at such trial, so far as it is necessary for the proper consideration of the various assignments of error. We will take them up in their order. The first assignment is that the court erred in denying the challenge to the panel, it being alleged that no minutes of the drawing of the various venires composing it were kept and filed by an attending officer; that arbitrarily and without cause the names of certain jurors drawn were set aside and not included in the venire; and that the sheriff intentionally omitted to summons some of the jurors drawn, in that he failed to give them the notice required by statute. Paragraphs 1018–1022,

inclusive, Penal Code of 1913, provide for the manner of presenting a challenge to a panel. It appears from the record that counsel for defendants complied fully with them. It also appears from the record that the county attorney neither excepted to the challenge, nor denied it, as provided by statute, but the same was disallowed by the court. We think that on the challenge being presented, it is the duty of the adverse party either to except thereto, which is in effect a demurrer, or to deny the facts set up in the challenge. Since neither of these things were done by the state we must presume it was admitted that the facts stated in the challenge were true, and that as a matter of law they were sufficient. The trial court therefore erred in denying the challenge to the panel. Was such denial, however, although erroneous, prejudicial and fatal?

We have had before us in the case of *Lawrence v. State,* 29 Ariz. 247, 240 Pac. 863, a somewhat similar situation. In that case a challenge to the panel was interposed, and it appeared that the law had not been complied with in forming the panel. We discussed the effect of such an error, and held as follows:

"Whatever may be the rule in other jurisdictions, we hold that in Arizona no cause, civil or criminal, will be reversed for formal error, when upon the whole case it appears that substantial justice has been done, and that prejudice will not be presumed, but must appear probable from the record."

In the present case, as in the Lawrence case, there is not the slightest suggestion that the errors committed in the formation of the jury resulted in any prejudice to defendants. The entire examination of the jurors on their *voir dire* is found in the transcript of evidence, and it appears therefrom that counsel for defendants agreed that every member of the panel was a duly qualified juror of Mohave

county. It further appears affirmatively from their examinations that each and every man who sat on any of the trials was absolutely fair and impartial in all respects. While we strongly disapprove of the lax practices prevailing in some of the superior courts in regard to methods of procedure, we shall not reverse a case on account of such laxity and a departure from the exact provisions of the statute, unless prejudice therefrom appears affirmatively probable upon the face of the record. In so doing we are following the instructions given by the people of Arizona in article 6, section 22, of the Constitution, which reads as follows:

"Section 22. The pleadings and proceedings in criminal causes in the court shall be as provided by law. *No cause shall be reversed for technical error in pleading or proceedings when upon the whole case it shall appear that substantial justice has been done.*" (Italics ours.)

The first assignment of error in regard to denying the challenge of the panel is well taken, but under article 6, section 22, *supra,* and the facts of the case, it is not sufficient of itself to justify a reversal of the case.

The second assignment of error is that the trial court should have set aside the information on the ground that the defendants had not been given a legal preliminary examination, the specific objection being that certain parts of paragraph 881, *supra,* were not observed. The particular portions of the paragraph pertinent to this objection are as follows:

"881. The examination of witnesses shall be oral, and neither their testimony nor that of the defendant shall be reduced to writing except as otherwise provided in this section. The testimony of each witness, in cases of homicide, must be reduced to writing, as a deposition, by the magistrate or under his direction, and in other cases upon the demand of the county attorney. The magistrate before whom the

examination is had shall, upon demand of the county attorney, order the testimony taken down in shorthand in all the examination herein mentioned, and for that purpose he may appoint a shorthand reporter. The deposition or testimony of the witnesses must be authenticated in the following form: . . .

"(5) It must be signed and certified by the magistrate when reduced to writing by him, or under his direction, and when taken down in shorthand, the transcript of the reporter appointed as aforesaid, when written out in longhand writing and certified as being a correct statement of such testimony and proceedings in the case, shall be *prima facie* a correct statement of such testimony and proceedings. The reporter shall, within ten days after the close of such examination (if the defendant be held to answer to the charge) transcribe into longhand writing such shorthand notes, and certify and file the same with the clerk of the superior court of the county in which the defendant was examined, and shall in all cases file his original notes with said clerk. . . .

"(7) The defendant or his counsel and counsel appearing for the state shall have the right to cross-examine the witness, and such deposition or testimony, when taken as provided for in these paragraphs, may be read upon any subsequent trial of such defendant for the offense for which he is held, either on behalf of the state or for the defendant, upon its being satisfactorily shown to the court that the witness who made such deposition is dead, or insane, or when such witness is shown by the return of the sheriff on a subpoena duly issued for his appearance, to be out of the jurisdiction of the court before whom the defendant is tried. But such deposition or testimony and each question and answer therein shall be subject to all legal objections in the same manner as if the witness were present and testifying."

It is claimed that the purported transcript filed does not show that the reporter was ever appointed to take the testimony by the magistrate, or that he was sworn, or that he took the depositions under

the direction of the magistrate. We think the record shows affirmatively sufficient facts to justify the trial court in holding that the statute was substantially complied with, and that any deviation therefrom was waived by defendants. *People* v. *Kelly*, 17 Cal. App. 447, 120 Pac. 46; *People* v. *Mullaley*, 16 Cal. App. 44, 116 Pac. 88; *People* v. *Riley*, 75 Cal. 98, 16 Pac. 544; *People* v. *Grundell*, 75 Cal. 301, 17 Pac. 214.

The third assignment is that the court erred in denying as insufficient defendant's affidavits of bias and prejudice. Under paragraph 999, Penal Code of 1913, which reads as follows:

"999. A criminal action may be removed from the court in which it is pending, on the application of the defendant, on the ground that a fair and impartial trial cannot be had in the county where the action is pending, and if the defendant shall make affidavit, supported by the affidavits of three resident electors of the county that he cannot have a fair and impartial trial because of the bias and prejudice of the superior judge of the county wherein such cause is pending, the judge shall call in some other superior judge of the state to preside at such trial,"

—we have held that such affidavits *when filed before trial* are in effect a peremptory challenge to the trial judge, and that he has no discretion in passing thereon. *Stephens* v. *Stephens*, 17 Ariz. 306, 152 Pac. 164. The affidavits were not offered for filing until after the trial of the case had been commenced, nor in fact was defendant's affidavit even signed at that time. The trial commences, for this purpose at least, when the jurors are first called into the box. *Caples* v. *State*, 3 Okl. Cr. 72, 26 L. R. A. (N. S.) 1033, 104 Pac. 493.

It further appears that the trial court followed the procedure indicated by us in *Speakman* v. *Sullivan*, 32 Ariz. 307, 257 Pac. 986, of bringing the signers of the supporting affidavits before it to determine whether the law had been complied with. It

appeared affirmatively in this case that the purported affidavits, while signed, had never been sworn to by the signers, and that they were made in reality for the purpose of obtaining a continuance and not because there was any belief that the trial judge was biased or prejudiced. It is unfortunately a more or less common practice in this state to use the statutory affidavit of bias and prejudice, when as a matter of fact the party filing the same has not the slightest idea of any actual prejudice existing in the mind of the trial judge, for the sole purpose of obtaining a continuance which the affiant has no legal ground for. If the affidavits are properly made and presented *before the trial,* notwithstanding their use for the purpose referred to seems hardly in accordance with the highest standards of legal ethics, under the plain and mandatory language of the statute they act, as we have indicated, as a peremptory challenge to the judge. We think, however, that while most trial judges, if they were convinced that such an affidavit represented a real belief on the part of the applicant that the judge was prejudiced, would promptly disqualify themselves, even though the affidavits were not technically sufficient, if it appears that they were made, not because of a real belief of prejudice, but to obtain a continuance which could not be obtained in any other manner, the trial judge is justified in holding the affiants to the strict letter of the law. It appears abundantly from the record that the affidavits were made for no other purpose than that of securing a continuance, and we hold that both because two of the supporting affidavits were not sworn to as required by statute, and because they were not filed in time, the trial court very properly refused to give them any effect.

It further appears that although the court informed counsel for the defense that if the latter wanted another judge in the other cases, and would

so indicate in time, he would see that one was present to hear them, counsel did not accept the offer, and made no further effort in the other cases toward disqualifying the trial judge.

The fourth assignment is that the court erred in refusing to grant a continuance. On examining the record it appears that the motion made was based substantially on two grounds: The first was that counsel for the defense had not had time to prepare for the trial of the case; and the second was that a material witness was absent. The law as to continuances in criminal cases is well laid down in *Shaffer* v. *Territory,* 14 Ariz. 329, 127 Pac. 746:

"The granting of a continuance for the purpose of securing the attendance of absent witnesses rests in the sound discretion of the trial court. *Halderman* v. *Territory,* 7 Ariz. 120, 60 Pac. 876. . . .

"The defendant was charged with the gravest offense known to our law. His trial was set for the third day after he entered his plea to the indictment. He had witnesses residing in the county of the trial; but he was not given sufficient time in which to produce these witnesses in his behalf at the trial. The law guarantees him that right. He is entitled to have them present; and, in order to benefit by the guaranty of the law, a reasonable time must be allowed him to require their attendance. His right to have counsel, and to have his counsel prepare his case for trial, is a substantial right, and to deny his counsel sufficient time in which to prepare the case is also the denial of a substantial right; and, under such circumstances, to have counsel appointed to represent him would be a meaningless formality and the granting of a barren right."

The question then is: Does it appear from the record that counsel did not have a reasonable time to prepare for trial, or that the defendant was unable by reason of the refusal to grant a continuance to secure material witnesses who would have been present had the continuance been granted? Discuss-

ing the last point first, it appears affirmatively from the record that the only witness whom defendant Sam expressed a desire to procure was one Wong Chong, who, it was claimed by defendant, had witnessed the shooting and would testify that it was done by other parties than defendants. If the application stated the truth in this respect, it was indeed error of the gravest kind not to give defendant a chance to procure the missing witness if there was any reasonable probability that by delay he could be obtained. It appears, however, from the record, that while the witness was not present at the trial of the defendant Sam, he was present at the trial of each of the other defendants, was placed on the stand by the state, and that he testified positively and emphatically that he did not see the men who did the shooting, that he had no idea who they were, and that he could not tell whether any of the defendants were among them or not. It is but reasonable to presume that had he been present at the trial of defendant Sam his testimony would have been the same. Such being the case, defendant Sam could not have been prejudiced in the slightest degree by his failure to have the testimony of the missing witness on his trial.

So far as the opportunity of counsel to prepare a defense is concerned, it appears affirmatively that he was first retained in these cases on the 27th of October, and represented the defendants at the preliminary examination, and that he again appeared for them on the 27th of November, when they were first brought up for arraignment. It is true that he says he did not represent them between those times. He must, however, have gained at least some knowledge of the case during the preliminary examination and during his consultation with his clients at that time. On the latter date he was informed by the trial court that the cases would in all probability be

called for trial on the 15th of December. He had, then, 18 days in which to prepare for trial. Each case must stand upon its own particular facts, and we have been unable to find one where under circumstances anything like those of the present one it has been held an abuse of discretion to refuse to grant a continuance. Counsel had nearly seven weeks from the time he was first employed, and almost three weeks from the time he was notified of the date the cases would probably be called for trial, for preparation. The trial judge gave excellent reasons why it was advisable they should be tried before the 1st of January, and we cannot say, in view of the record as a whole, that the court abused its discretion in denying the motion for a continuance on the ground of an absent witness or insufficient time for preparation. It is true counsel stated he was physically exhausted and unable to proceed, but it appears from the whole record that he must have underrated his recuperative powers, for the cases were conducted throughout with the highest degree of professional skill, and we are satisfied that no counsel with unlimited time for preparation could have legitimately done more for defendants than Mr. Wallace did.

The fifth assignment of error is that the court erred in instructing the jury as follows:

"If you believe beyond a reasonable doubt that the defendant is guilty of the crime of murder, but you are not satisfied that it is murder beyond a reasonable doubt, and that it is murder of some grade and that it is murder of some degree, then you will find the defendant guilty of murder of the second degree and state in your verdict: 'We, the jury, duly impaneled and sworn in the above-entitled action, upon our oaths do find the defendant Shew Chin guilty of murder of the second degree.'"

While the assignment gives the instruction in the Shew Chin case, substantially the same one was

given in each of the other cases, the name of de-
fendant being changed. This instruction, standing
alone and taken literally, is of course absolutely
contradictory and unintelligible on its face. It says
that if the jury believes beyond a reasonable doubt
that the defendant is guilty of the crime of murder,
but they are not satisfied that it is murder beyond a
reasonable doubt, but are sure it is murder of some
kind, they will find the defendant guilty of murder in
the second degree. It is the well-established rule in
this jurisdiction, however, that instructions must be
construed as a whole. *Quong Yu* v. *Territory*, 12 Ariz.
183, 100 Pac. 462; *Lenord* v. *State*, 15 Ariz. 137, 137
Pac. 412; *Faltin* v. *State*, 17 Ariz. 278, 151 Pac. 952.
On examining the ones given in the present cases
we find that the court properly defined murder in
the first degree and murder in the second degree;
that it was particularly careful to tell the jury not
only once, but repeatedly, that the guilt of the de-
fendants must be proved beyond a reasonable doubt,
and, unless it was so proved, that the jury must
acquit them. If the jury gathered any meaning at
all from the instruction complained of it must have
been that under the circumstances detailed therein
they would find the defendants guilty of murder in
the second degree. If they had returned that ver-
dict perhaps there might be some excuse for claiming
the instruction complained of misled them, but since
their verdict was of murder in the first degree, and
that crime and its essential ingredients were prop-
erly described, we think it is evident that the erro-
neous instruction could have had no effect upon
them, and the error was not prejudicial.

Assignment No. 6 is that the court erred in deny-
ing defendant's motion for a new trial. There are
some five grounds set up therein: The first is the
erroneous instruction just discussed. The second is
that the court erred in admitting in evidence over the

objections of defendant the transcript of the testimony of Don On, taken at the preliminary hearing of defendants, for the reason, first, that it was not taken in the manner provided for in section 881, *supra;* and, second, that the necessary foundation was not laid for its introduction. The first point has already been disposed of by us. The second presents a far more serious question.

Subdivision 7 of section 881, *supra,* under which the testimony was offered, has been quoted above. It appears therefrom that when a witness has testified at a preliminary examination, and the defendant has had a right to cross-examine him, and his testimony has been taken as provided by the statute, it may be read "when such witness is shown by the return of the sheriff on a subpoena duly issued for his appearance, to be out of the jurisdiction of the court before whom the defendant is tried."

Statutes of this nature have been before the courts of the various states for construction many times, and there is a wealth of authority on the general subject, but nothing on all-fours. This particular statute has never been construed by this court, but paragraph 1052, Penal Code of 1913, which deals with the subject of testimony taken, not at a preliminary examination, but at a previous trial of a defendant, is the same in principle and in substance, although not in exact language. It provides as follows:

"1052. Whenever in any court of record the testimony of any witness in any criminal action shall be phonographically reported by an official court reporter and certified by him to be correct, and thereafter said witness shall die or be beyond the jurisdiction of the court in which the cause is pending, and his absence is not procured by the party offering the evidence, either party to the record may read in evidence the testimony of said witness in any subsequent trial or proceeding had in the same cause, subject only to the same objection that might be

made if said witness were upon the stand and testifying in open court."

We have construed it in the case of *Valuenzuela* v. *State,* 30 Ariz. 458, 248 Pac. 36, and we think the reasoning of that case applies very well to the question before us. Therein we state:

"Our Constitution, as most of the Constitutions of the states, has a provision that a defendant shall have the right to be confronted by his witnesses, or that he shall have the right to meet them face to face. Section 24, art. 2, Constitution. Practically all the states with such a provision have held that the rights guaranteed thereby are not violated, if the defendant, either in person or by counsel, has been present and has cross-examined the witness, or had the opportunity to do so. . . .

"The statute above permits and authorizes the use of the transcript of the testimony as made by the phonographic report instead of the oral testimony of witnesses. . . . That section does not provide how the death of the witness, or his absence from the court's jurisdiction, shall be established. Possibly the statute might have made the sheriff's return, or his affidavit of diligence to locate and serve the witness, sufficient, but it does not do so. We have read a great number of the reported cases where the question of the sufficiency of the predicate laid for the purpose of admitting testimony given at a previous trial was passed upon, and in all of them, except one, such preliminary proof was made by witnesses testifying in the trial confronted and cross-examined by the accused. . . . While section 1052, *supra,* does not provide that the foundation for the use of the testimony shall be satisfactorily shown to the court, that, no doubt, is the right rule, and it means it must be shown by competent evidence."

We think the rule laid down in the Valuenzuela case is the one to apply in this. While the statute in question states that the witness must be shown by the return of the sheriff on a subpoena duly issued to be out of the jurisdiction of the court, such subpoena is merely preliminary evidence, and not

conclusive on the subject, and either party may supplement it by the testimony of witnesses on the stand, the ultimate test being whether the court is satisfied the witness is beyond its jurisdiction. In the present case a subpoena was issued on the fifteenth day of December for Don On, Chan Cheung and Wong Chong, and placed in the hands of the sheriff for service. The return, dated the seventeenth day of December, shows:

"That the within subpoena could not be served upon Don On and Wong Chong, for the reason that after diligent search and inquiry neither of said last-named witnesses could be found within the said county of Mohave, Arizona."

Not satisfied with this, however, Sheriff Mahoney was called to the stand and testified that a subpoena for Don On was delivered to him for service; that he had wired to the sheriffs of every county in the state of Arizona requesting them to search for the witness; that he had instructed five deputies to search in practically every community in Mohave county, and they each reported to him that the witness could not, after diligent search had been made, be found; that he himself had made a personal investigation and was informed that Don On was in the state of California. He was further asked by the court as to whether he had gotten any other information or knew of anybody who knew where the witness was, to which he replied that he had not, and that his best information was that he left Kingman the 13th or 14th of December for California. D. F. Meredith, a deputy sheriff, testified that he had searched for the missing witness in Chloride, and that the son of Wong Chong, the other missing witness, informed him that both Wong Chong and Don On were in California. The sheriff also testified that the reason a subpoena had not been issued sooner was because the officers were afraid that if

they issued it too much in advance of the trial the witness would become frightened and leave the jurisdiction of the court. No evidence was offered by the defense in any way contradicting this testimony.

It is apparent to us that the state endeavored to follow strictly the ruling of the Valuenzuela case, *supra*, in showing the absence of the witness from the jurisdiction of the court. Was such showing sufficient? It is urged first, that the return of the sheriff does not comply with the statute in that it merely shows that the witness could not be found "within the said county of Mohave, Arizona," and not that he was, in the language of the statute, "out of the jurisdiction of the court." Under the Constitution of Arizona the jurisdiction of the superior courts of the various counties in some respects is confined to a particular county and in other respects reaches over the entire state. In so far as venue in a criminal case is concerned, the crime must have been committed within the boundaries of the county to give the superior court jurisdiction to try it; but its processes in both civil and criminal matters run throughout the entire state and not merely in the county. A subpoena issued by the superior court of Mohave county could be served by the proper officer anywhere within the state of Arizona, and we think that the phrase, "out of the jurisdiction of the court," as used in subdivision 7, *supra,* refers to the jurisdiction over which its processes extend, and not merely to the territory in which the crime must have been committed.

It would be too technical, however, especially in view of the possible and natural confusion in regard to the meaning of the phrase "out of the jurisdiction," to hold that the exact language of the statute must be followed in the sheriff's return. The purpose of requiring a return is evidently to

show that a subpoena was issued and service attempted. The ultimate test in all cases is: Does the court believe, on evidence consisting of the sheriff's return to the subpoena, and such oral testimony as is offered, that the witness is outside the jurisdiction of the court, and did the evidence reasonably support such belief? Tested by this standard, we think the court did not abuse its discretion in deciding that on the showing made Don On was absent from the jurisdiction of the court. Practically every town and hamlet in Mohave county had been diligently searched. Every sheriff within the state had been notified that the witness was wanted, and the son of another missing witness, also a Chinese, informed the sheriff's office that Don On had gone to California.

But it is also urged that it must appear that the state used due diligence in issuing the subpoena, and that the placing it in the hands of the sheriff for service only one day before the trial was such gross neglect as to bar the use of the deposition, even though the witness was actually beyond the jurisdiction of the court. The statute does not expressly require that the subpoena must be issued at any particular time, but it is generally assumed by the cases that if the witness is absent through the negligence of the party offering the testimony the showing is insufficient. *Motes* v. *United States,* 178 U. S. 458, 44 L. Ed. 1150, 20 Sup. Ct. Rep. 993.

Ordinarily it would be considered negligence on the part of either the state or the defendant, if knowing the testimony of a certain witness would probably be required, either one wishing the testimony failed to issue process for securing his presence a sufficient time in advance of the trial so that proper service could be made in ample time. The rule, however, is subject to exceptions, and if a good cause can be shown for the apparent neglect,

it is not fatal. It appears that the missing witness was a Chinese; that he had testified voluntarily at the preliminary; that his place of business was and had been for a considerable period of time in Kingman; and that he had been seen there within a day or two of the time the case was set for trial. While the showing made on the question of due diligence is not strong, we cannot say affirmatively that the trial court abused its discretion in holding that the late issuance of the subpoena was not such negligence as to render the transcript of the testimony inadmissible; especially in view of the fact that nothing then appeared tending to contradict the preliminary showing made by the state. It is said, however, that it appeared afterwards that at the time the witness was actually within the jurisdiction of the court. We have held in *Inspiration Con. Copper Co.* v. *Bryan,* 31 Ariz. 302, 252 Pac. 1012, that the test is not whether as a matter of fact the witness was actually within or without the jurisdiction, but what the reasonable belief of the court on the showing made at the time was, and the mere fact that it afterwards appears the witness had been within the jurisdiction of the court would not justify a new trial unless it were also shown that if the witness had been present at the trial his testimony would have been materially different from that given at the previous hearing. We therefore hold that the court did not err in permitting the testimony of the witness Don On, given at the preliminary examination, to be read to the jury on the various trials.

The third subdivision of this assignment was that the witness Oker was permitted to testify that during the month of October, 1926, a war existed in the western states between two Chinese societies or tongs, known as the Bing Kong tong and the Hop Sing tong, and that many killings had occurred

in California during this war. This evidence, of course, was offered for the purpose of showing motive on the part of the defendants. If, as a matter of fact, deceased was a member of one of the tongs, or a partisan thereof, and if as a matter of fact the defendants or any of them were members or partisans of the opposite tong, the evidence objected to would be admissible, its weight, of course, being for the jury. *People* v. *O'Bryan*, 165 Cal. 55, 130 Pac. 1042.

It appears from the testimony that among the effects of the deceased was found a receipt of some nature from the Hop Sing tong, and that upon the person of one of the defendants at the time of his arrest was found another document which was a receipt or membership card in the other tong. It is true that the names given on the two membership cards were not the names commonly used by the persons in whose possession they were found. It is a notorious fact, however, that the names used among Americans for Chinese are frequently entirely different from those used among and by themselves. We think that the mere possession of these receipts, especially in view of the fact that such possession was unexplained, was sufficient to allow the testimony to go to the jury, its weight and sufficiency, of course, always being for them.

The fourth subdivision is that the trial court erred in permitting one Wong Chong (not the Wong Chong subpoenaed on behalf of defendants, but another person) to act as interpreter to the jury. It appears that the court had brought an interpreter from Los Angeles, California, for use during the trial, but that when certain documents were given to him he admitted that while they were written in Chinese, he was unable to interpret them. Thereupon the court, at the request of the state, permitted the said Wong Chong to give his interpretation of

the document. It is the defendant's theory that since Wong Chong admitted he was a member of the Hop Sing tong, to which the state claimed deceased belonged, he was therefore incompetent to act as interpreter. The regular interpreter secured by the court professed to be unable to translate the documents. It was therefore obviously proper and necessary for the court to secure someone else who could read them. It was suggested by the state that a certain Chinese present could translate them, and it appears from the record that he did translate them, and that while the regular interpreter had previously stated that he could not read them, on Wong Chong's doing so, he was able to check over the interpretation and agreed with it. None of defendants suggested that the interpretation was incorrect. We think there is no showing under the circumstances that the court abused its discretion in permitting Wong Chong to act.

The fifth subdivision is based upon certain alleged improper remarks made by the trial court. The ones complained of were those made by the court upon the filing of the affidavit of bias and prejudice, and which we have quoted previously. We are of the opinion, after reading the entire record, that the only inference which could or would be drawn from them by the jury was that if counsel insisted in disqualifying the trial judge the latter would see that some other judge was present to proceed with the cases, and that he (counsel for defendants) might select any other judge in the state that he wished to try them, but that they must be tried before the first of the year. The reasons stated by the court for its insistence on a trial at that time in our opinion were excellent ones. It is a notorious fact that the defendant in a criminal case, and particularly in those of the graver grades, is almost invariably anxious to continue his case and delay

its trial until the incident out of which it arose has passed into oblivion. It is well known that the longer he can postpone a trial, particularly if he is actually guilty, the greater his chance of an acquittal. One of the disgraces of criminal procedure all over the United States, and one which has been denounced by all those interested in the administration of real justice, has been the unseemly delay so frequently found in our courts, and we think the determination of the trial judge to see that the cases were heard at that jury term, especially in view of the unusual circumstances to which he alluded in his remarks in regard to the change of officers which would occur on the first of the year, was fully justified. Such being the case, we think his remarks could in no way have prejudiced the jury.

This concludes a review of the various assignments of error. It appears therefrom that two, and two only, were well taken, but that the errors complained of therein could in no manner have affected the substantial rights of the defendants or the results of the trials. Under article 6, section 22, of the Constitution, *supra*, it is provided that no cause shall be reversed for technical error when upon the whole case it appears that justice has been done. We have examined the record and read the entire transcript of the evidence in all of the cases most carefully. We are satisfied beyond any reasonable doubt from such evidence that defendants and each of them were coactors in a conspiracy which was intended to result, and which did result, in a wilful, deliberate and premeditated murder, without the slightest circumstances tending to show justification or excuse, or anything even in mitigation of the extreme penalty. That the deceased was shot down in cold blood by three of these defendants, while quietly and peacefully sitting in his place of business, and that the other two defendants knowingly assisted in the mur-

der, is shown as plainly by all of the evidence submitted to the various juries as it is possible to show anything short of mathematical demonstration. If there was anything occurring during the course of the trial and appearing in the record before us which indicated that through any mistake of law any of these defendants had been deprived of a substantial right or of an opportunity to raise in the minds of the jury a reasonable doubt as to their guilt, we would not hesitate to reverse the case; but there is nothing so appearing.

It is indeed a solemn and painful duty for this or any other court to determine that five human beings must lose their lives, but the decision of that question is a duty imposed on us by law, and we may not shirk it, however painful it may be. The rights of society are superior to the personal interests of any individual member thereof. The state of Arizona has the right to demand that private war and murder, whether committed by its own citizens or by aliens, cease, and if in enforcing that mandate against those who have knowingly and wilfully violated it, the law adjudges that the offenders pay the extreme penalty, we can but affirm the judgment.

There is one other matter concerning which we desire to say a few words. It is the rule in this court that we must consider the cases brought before us solely upon the record as it is presented under the law. *Martin* v. *State,* 22 Ariz. 327, 197 Pac. 578; *Barton* v. *Territory,* 10 Ariz. 68, 85 Pac. 730. And indeed, such is the law in practically every state in the Union. 17 C. J. 179. The reason therefor is well stated by Judge BAKER in the Martin case, *supra,* as follows:

"This is not a trial court, but an appellate court. Should we consider these *ex parte* affidavits, it would be necessary that we have the state served with a copy of them and permitted to introduce evidence in rebuttal thereof, in fact reopen the case and convert

this court into a trial court on the merits of the case, and then substitute our finding on the facts as those presented to us for that of the verdict of the jury. This is wholly impractical and unauthorized by our statute.''

During the oral argument counsel for defendants repeatedly alluded to certain affidavits made after the appeals from the verdicts and judgments had been perfected by witnesses who testified at the different trials, and presented to the lower court on motions to vacate the judgments and grant a new trial, claiming such affidavits showed conclusively that the conviction of these defendants was secured on perjured testimony. We have examined the record carefully on this point in particular, and we are satisfied that on this appeal we cannot consider them. This does not mean, however, that if the defendants are innocent they are without remedy. After the affirmance of this judgment there is another tribunal which has ample power to correct any miscarriage of justice. Defendants may present their cases to the board of pardons and paroles of the state. That board has the opportunity, which under the law we have not, of examining these affidavits, of hearing the affiants personally if present, or listening to anything which may be offered by the state to contradict the affidavits or the statements of affiants, and then may either grant a full pardon to defendants, if their innocence appears on such hearing, or, if it does not, they will allow justice to take its course.

Believing, as we do, that no error of law has been committed during the trial prejudicing the substantial rights of the defendants, and that their guilt is so conclusively shown by the evidence that no reasonable jury could have found any other verdicts than those returned, the judgment of the superior court of Mohave county is affirmed.

ROSS, C. J., and McALISTER, J., concur.