[Crim. No. 6107. Second Dist., Div. Two. Oct. 16, 1958.]

THE PEOPLE, Respondent, v. JOHN C. WILLIAMS, Appellant.

John C. Williams, in pro. per., for Appellant.

Edmund G. Brown, Attorney General, William E. James and N. B. Peek, Deputy Attorneys General, for Respondent.

ASHBURN, J.—Convicted of robbery of Howard Lee Johnson while armed with a deadly weapon (Pen. Code, §§ 211 and 211a), defendant, appearing in propria persona, appeals from the judgment and an order denying his motion for new trial. At the trial he was represented by the public defender of Los Angeles County.

First, appellant claims insufficiency of the evidence to sustain the verdict, asserting "numerous instances of per-*jurous* inconsistency" in the testimony of the complaining witness. The argument centers upon the matter of identification of the robber. Appellant says: "That factor (darkness) makes it impossible, according to Mr. Johnson's testimony, for him to have identified the robber." ▪ As our duty begins and ends with ascertainment of a substantial conflict in the evidence, we " 'must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' ▪ If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury." (*People* v. *Daugherty*, 40 Cal.2d 876, 885 [256 P.2d 911].) To the same effect see *People* v. *Walker*, 154 Cal. App.2d 143, 147 [315 P.2d 740]. That the evidence is sufficient to sustain the verdict is clearly apparent from the record.

Howard Lee Johnson, on his way home from work, stopped at McDonald's Café in the early morning of May 24, 1957; there he remained with friends for an hour or an hour and a half, one of the friends being Bill Dennis. Seated behind Johnson during that time was defendant Williams, whom he saw on that occasion and had seen frequently in that place.

Johnson had some $52 on his person in his shirt pocket. It was arranged that Dennis would follow him to his home. At about 4 a.m., after Johnson had reached his residence, there was a knock on the door. "Who is it?" "Bill." This inquiry and answer were repeated and Johnson opened the door thinking the caller was Dennis. When he did so he was confronted by defendant, whom he then recognized. Defendant had an automatic pistol in his hand and said, "Give it to me." "What?" "The money." Defendant reached for Johnson's shirt pocket, Johnson got hold of him, there was a tussle, the pistol, then pointed at the floor, was fired and defendant snatched Johnson's money and ran. Johnson summoned the police and Officer Houston soon arrived. He found and preserved a lead slug from the gun which had buried itself in the porch between the wall and the doorstep.

Three or four weeks later Dennis (who had arrived at Johnson's house before the police on the morning of the robbery) telephoned Johnson from McDonald's Café and told him that defendant was there. Johnson took police to the place and defendant was there arrested. Later Johnson went to a police line-up and there identified defendant as the robber. He did so again at the trial. Officer Houston corroborated Johnson's testimony to the extent of saying that he found the slug from the gun buried in the porch; he preserved and presented it in court.

Defense counsel sought to weaken Johnson's testimony as to the foregoing facts by cross-examination concerning defendant's clothing, whether his hair was long or short, whether he had a mustache or a goatee or neither one. At best this created a conflict in the evidence which was resolved against defendant by the jury and again by the trial judge.

Defendant testified that he was not a party to any robbery of Johnson, was not at his house with a gun on the 24th, never saw Johnson at McDonald's or elsewhere prior to his own arrest on June 17th, although he had been at that café some 20 times. To this he added the defense of alibi. He and Marie A. Chanel had lived together, at least intermittently, without the sanction of a marriage ceremony, for some years, begetting four children. His testimony was that he won some money in shooting dice on the 24th and so he took his "girl friend" that evening to the Celebrity Club where they stayed from about 11 p.m. to 2 or 2:15 a.m.; while there they saw and talked with Doris Concepcion and Eliza Hayward and other acquaintances; from the club they went to Marie's home,

had some sandwiches and went to bed together; there he remained until about 8:30 or 9 the next morning. Thus it was impossible for him to have committed the robbery. Marie corroborated this testimony, adding the fact that she was awakened by one of the children at about 4:30 a.m. and then saw that defendant was still in her bed. In all he spent seven nights with her in that month of May and there was nothing unusual about this night on the 24th which would cause it to stand out in memory. Defendant himself disclosed the further fact that about three days after his arrest, "I asked her what day was it that we went to the club, and we talked about what day I went to the club, and everything, so we got our heads together and I said, 'It's not possible for me to have held up this man this particular time,' I said, 'because we was at the club.' Q. And when you and Miss Chanel got going over these things in your own minds, it was just by a happenstance that was the night you went to the Celebrity Club? A. Yes, sir." Obviously the jury was not required to accept this alibi testimony (*People* v. *Baserto,* 162 Cal. App.2d 123, 125 [327 P.2d 558]). The testimony of Johnson and of Officer Houston, accepted by the jury, made a complete case against defendant.

Next appellant argues that the prosecutor was accorded undue latitude in cross-examination in that he himself was interrogated about a conversation he had with the police, one which is claimed to be outside the scope of proper cross-examination because he had not mentioned it in his direct testimony. Of course there is no merit in this contention. ▮ After quoting section 1323, Penal Code,[1] the Supreme Court said, in *People* v. *Zerillo,* 36 Cal.2d 222, 228 [223 P.2d 223]: "This does not mean that the cross-examination must be confined to a mere categorical review of the matters, dates or times mentioned in the direct examination. [Citations.] It may be directed to the eliciting of any matter which may tend to overcome or qualify the effect of the testimony given by him on his direct examination. ▮ . . . If a defendant takes the stand and makes a general denial of the crime with which he is charged the permissible scope of cross-examina-

[1]Section 1323 of the Penal Code provides: "A defendant in a criminal action or proceeding cannot be compelled to be a witness against himself; but if he offers himself as a witness, he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief. . . ."

tion is very wide. [Citations.] Moreover, as stated in *People* v. *Teshara,* 141 Cal. 633, 638 [75 P. 338], 'A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies. He can be cross-examined with respect to facts or denials which are necessarily implied from the testimony in chief, as well as with respect to facts which he expressly states.' "

Closely related to the foregoing contention is that of permitting improper rebuttal evidence. On cross-examination defendant was asked: "In other words, once you knew that the offense here alleged was alleged to have been committed on the 24th of May, you immediately remembered you had been to the Celebrity Club that evening and had been shooting dice? A. No. No, not right then. No." In further response he volunteered information as to a conversation with the police: "[W]hen I was at 77th Street Police Station . . . they told me, asked me did I know this man and I said no, I never seen him before. They called his name. I didn't remember his name. They called four more names and had the address, and I do remember he said this man worked at some kind of aircraft place, and three of the other guys' names on there worked at the aircraft place, but the other guy, he worked somewhere else; and he said, 'Williams, you could be getting around but,' he said, 'if you did not do the robbing, it was somebody probably who looked like you. You went out to this man's house. They were playing poker. You held them up.' I denied. I didn't know the man or any of the fellows who were supposed to have been there. When he gets to the preliminary hearing, he says he was home by himself and the whole thing is a mystery to me. That's why I am confused."

Asked if he did not tell the investigating officer he had been to McDonald's on the 24th of May he said he did not. To the inquiry whether the officers talked to him at the 77th Street Police Station about the night of May 23-24, his counsel objected and the court sustained the objection. Defense counsel at the bench then objected to any conversation between defendant and any officer as outside the scope of the direct examination; also: "That it will be, maybe, evidence in the nature of an admission and, if such, it should have been placed by the People in the case in chief. Not having

done so, they would waive at this time the right to proceed on such evidence if it is tantamount to an admission.'' The prosecutor avowed that he expected to show inconsistent statements by way of impeachment and the objection was overruled. Thereupon defendant testified that he had had no conversation with Officer Griffin at all; that he did not tell him he was at McDonald's on the 24th in the early morning hours; that he had a conversation with Griffin's partner; he did not tell Griffin he did not know whom he saw that night or did not know where else he went that night. In rebuttal Officer Griffin testified that on June 20 defendant told him he had been at McDonald's drive-in on May 24th in the early morning hours. Counsel again objected on the ground that this evidence was part of the prosecution's case in chief. The officer also said that the defendant told him, '' 'I don't know who I saw that night. I see a lot of people' '' and '' 'I don't know where else I went that night.' ''

Appellant's claim is that this was a violation of the rule that the prosecution cannot hold back part of its case in chief until after defendant has rested and then surprise and embarrass him by producing it in rebuttal. ■ ''In criminal cases, as in civil, the order of proof lies in the discretion of the trial judge. [Citations.] But the practice of permitting the prosecution to withhold a part of its case for use on rebuttal has been severely condemned.'' (*People* v. *Newton,* 139 Cal.App.2d 289, 291 [293 P.2d 476].) ■ ''The purpose of the restriction in that section is to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of trial with an additional piece of crucial evidence. ■ Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.'' (*People* v. *Carter,* 48 Cal.2d 737, 753 [312 P.2d 665].)

Fricke on California Criminal Evidence, Third edition, page 325: ''While a party should not be allowed to introduce

part of his testimony at one stage of the trial and withhold other testimony to be introduced as rebuttal when it may be more effective the trend of a trial is often changed when the adversary puts on his case and raises a relatively minor issue to a position of such importance that the developments should, in the interests of justice, permit the introduction of evidence to meet the enlarged issue even though such evidence belongs in the case in chief and not on rebuttal. While it is improper for the prosecutor to withhold evidence which is properly a part of his case in chief and offer it after the defense has closed its case, such procedure does not call for a reversal where the defense is thereafter permitted to introduce evidence in rebuttal of that so introduced by the prosecution and the defense has not been put to a substantial disadvantage (*People* v. *Avery*, 35 Cal.2d 487 [218 P.2d 527]). Such evidence may, however, properly be used by the prosecutor where it comes within the rules of Impeachment (q. v.) and may be properly admissible on rebuttal to meet evidence upon a point put into dispute by the testimony for the defense.''

It cannot be said at bar that there was any impropriety in the prosecutor's procedure. He had made a clear case before resting. It was not necessary for him to anticipate and disprove every possible defense or alibi of the defendant. The evidence under discussion was directed toward defendant's alibi. He himself had given a portion of his conversation with the police and the prosecutor was entitled to develop the rest of it. (*Cf. People* v. *Sutton*, 73 Cal. 243, 245 [15 P. 86]; 98 C.J.S. § 392, p. 164.)

Likewise these questions were proper as the basis for impeachment under Code of Civil Procedure, section 2052. (*People* v. *Scalamiero*, 143 Cal. 343, 350, 351 [76 P. 1098]; *People* v. *Durrant*, 116 Cal. 179, 220 [48 P. 75]; *People* v. *Kimball*, 23 Cal.App.2d 32, 34 [72 P.2d 157].) ''In the present case, the People did not withhold a material part of the case until rebuttal, but offered rebuttal testimony to support their case in chief after it had been controverted by the defendant. The evidence was properly admitted.'' (*People* v. *Nye*, 38 Cal.2d 34, 39 [237 P.2d 1].)

Appellant claims that the deputy public defender who conducted his case ''proved himself to be incompetent, indifferent and oblivious to his duty to protect the rights of his client'' and therefore appellant should have a reversal. On this subject *People* v. *Wein*, 50 Cal.2d 383, 410-411 [326 P.2d 457],

says: "The handling of the defense by counsel of the accused's own choice will not be declared inadequate except in those rare cases where his counsel displays such a lack of diligence and competence as to reduce the trial to a 'farce or a sham.' [Citations.] The record in this case does not even remotely approach such a situation. Defendant's sole defense lay in his claim that his identification by the victims was incorrect. His counsel vigorously cross-examined the prosecution's witnesses to test their memories, and assiduously attempted to establish an alibi and to show defendant's good character. He at most committed what in retrospect may be claimed to be mistakes in judgment by following certain strategy employed. Such mistakes, if any, do not constitute a denial of due process." The trial judge considered that defendant had been adequately represented in this case. "THE COURT: Wait a moment, Mr. Williams. I have told you before and I am telling you again, just answer the question. Mr. Breckenridge is a good attorney. He will ask you everything that he wants." Upon the argument of the motion for new trial the court told the defendant, who was speaking in his own behalf, "I think you had a good, fair trial." Again, "As I say, Mr. Williams, I feel that you had a fair trial. I do not feel that the jury made a mistake." Our own examination of the transcript discloses that defendant had a fair trial and was adequately represented by the deputy public defender in charge of the case.

 Finally appellant says that when he asked the judge what procedure to follow in order to "appeal for a new trial" the judge "did so distort, garble, misquote and equivocate the necessary process, which the defendant was bound to follow by the rules adjudicated by the California Judicial Council, that had the defendant been lulled into a temporary sense of legal security and followed the '30 day,' dubious, evasive and fraudulent course as directed by the Court (Judge Odemar) then he would have been most decidedly duped and defrauded by the Court to the extent of forfeiture of his right to a direct appeal." The reference is to the following colloquy: "DEFENDANT WILLIAMS: Your Honor, Judge, I would like to make a motion for an appeal. THE COURT: Well, all right. You are making an oral notice of appeal at this time. It will be necessary for you to take the regular steps that are necessary in an appeal, which will have to be done within 30 days." But appellant was not misled by this "30 days"

misstatement, for he was sentenced on September 27, 1957, and filed his notice of appeal three days later, on September 30th, well within the time prescribed by the rule.

No prejudicial error appearing, the judgment and the order denying the new trial are affirmed.

Fox, P. J., and Herndon, J., concurred.