[Crim. No. 13833.    Second Dist., Div. Three.    Mar. 11, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JERRY LEE SLUTTS, Defendant and Appellant.

Frank G. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Nicholas C. Yost, Deputy Attorney General, for Plaintiff and Respondent.

MOSS, J.—Defendant was adjudged guilty after trial to the court of indecent exposure with a prior conviction of the same offense, a felony under section 314, subdivision 1 of the Penal Code. Criminal proceedings were suspended and defendant was committed to Atascadero State Hospital for observation and diagnosis as a probable mentally disordered sex offender. Upon his return from the hospital he was sentenced to state prison. He appeals from the judgment.

The principal questions raised by this appeal are: (1) whether the technique employed by the police in securing the identification of defendant before trial through the use of photographs resulted in the denial to defendant of due process of law, and (2) whether the failure of the court to

follow the proper procedure for finding him a probable· mentally disordered sex offender constituted reversible error.

While Peggy Miller, aged 11, and her sister Sandra, aged 14, were playing in a park across the street from their home sometime between 5 :30 p.m. and 8 p.m. on a week day in May, 1966, they saw a white man with a beard seated on the driver's side of a green car nearby. The man was wearing bathing trunks and a beach jacket. He did not wear glasses or a hat. Peggy was wearing a dress; Sandra had on shorts and a short blouse. While the girls were on the grass, the man left the car, walked over to a wall about 10 feet from them, sat down and watched them for five or ten minutes. The man and the girls did not speak to each other. The girls then climbed upon the parallel bars which were about five feet high. The man returned to his car, drove it to a point nearby and rolled down the window. From where Peggy was sitting on the parallel bars she could see into the car. She saw the man expose his penis and handle it. Sandra did not see the man expose himself. Peggy told her sister to get down. As Sandra got down, the man made an indecent remark about her appearance. Peggy heard the man mumble, but did not hear what he said. The girls went over to the swings. The man drove the car near to where the girls were on the swings. At Peggy's suggestion the girls walked home which was about one-half block away. Peggy told her mother what had happened. The man followed in the car and parked alongside their house for a while and then left. Before leaving the park, the girls memorized the license number of the man's car. Peggy memorized the letters "PJX" and Sandra the numbers "486". The girls saw the car again the next day at a bowling alley. They noted that it had the same license plate and was a Plymouth Satellite. Inside the bowling alley Peggy saw the man again. She pointed him out to her parents. He was still wearing a beard. At the time of the incident in the park defendant wore a beard and was the registered owner of a blue-green Plymouth Belvedere Satellite bearing license number PJX 486.

Approximately eight days after the incident was reported to the police the investigating officer in the case, Barbara Perkins, visited Peggy and then Sandra at their respective schools. She showed Peggy five photographs including one photograph of defendant. The other photographs were of men having the same general appearance as defendant. None· of the persons shown in the photographs wore a beard or a mustache.

Peggy pointed out the picture of defendant as most closely resembling the man she had seen in the park. She said, "This is close." Officer Perkins then drew a beard and mustache on the picture of defendant. Officer Perkins testified that Peggy then said that "she thought that he was the one." Peggy, in her testimony, was more equivocal: "Q. And she then drew a beard and a mustache on it? A. Yes. Q. Did it then look like the man? A. Not exactly. Q. Did you tell her that it looked like the man? A. No. Q. Did you tell her, 'This is the man'? A. No. Q. The picture that you saw that you said was close, was this a picture of the defendant, the man at the far end of the counsel table? A. I don't know." About an hour later, Officer Perkins showed the photographs, including the one of defendant on which she had drawn a beard, to Sandra. Sandra pointed to the picture of defendant and said, "This is the man that looks most like it."

At the time defendant was arrested he appeared to have recently shaved off his beard and mustache because the skin which had been covered by his beard appeared to be lighter than the rest of his face. Both Peggy and Sandra identified defendant at the preliminary hearing as the man in the park, but at the trial they both refused to make a positive identification.[1]

---

[1]*Peggy testified*: "Q. Now, directing your attention to the man at the far end of the counsel table, have you seen him before? A. Yes. Q. Do you remember when you first saw him? A. Yes. Q. When was that? A. Well, I'm not sure if it was, but we saw a man that looks like him over at the park. . . . Q. The picture that you saw that you said was close, was this a picture of the defendant, the man at the far end of the counsel table? A. I don't know. Q. This gentleman sitting here, would you be certain, are you sure that's the one that you saw at that time? A. No. Q. Do you feel that perhaps he may not even be the one? A. Yes. Q. In other words, it could have been any man of a similar build but who may have been wearing a beard? A. Yes. . . . Q. But you have so stated, and I would ask you the final time that at no time from any of the pictures did you select this gentleman, and at the time of the incident—not the pictures being shown and looking at this gentleman—you have so stated you don't believe this is the man, is that correct, or words to that effect? A. Yes. . . ."

*Sandra testified*: "Q. Did you pick any picture out? A. I picked the one that resembled it the most. Q. And that was a photograph of the defendant? A. I don't know—I don't know. I'm not sure. Q. At that time when you saw the pictures did you tell Mrs. Perkins 'That's the man?' A. I said, 'This is the man that looks most like it.' . . . Q. When you looked at that picture with the beard, did you identify him as the gentleman you see today? Were you sure that's the man? A. No. I said, 'This is the man that looks most like it.' Q. Because it already had a beard and mustache sketched on? A. Yes. Q. So it looked more like another man with a beard and mustache? A. It looked—it looked similar to the man. Q. Right. Now, for one minute forgetting the pictures, Sandra, recalling the day of that particular incident when a few minutes

*The pretrial identification procedure was improper,
but constituted harmless error.*

In *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], the United States Supreme Court observed, ''A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. . . . Moreover, '[i]t is a matter of common experience that, once a witness has picked out the accused at the lineup, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.' '' (388 U.S. at pp. 228-229 [18 L.Ed.2d at pp. 1158-1159].)

A recognized ground of attack upon a conviction is the claim that the identification technique employed in the case was ''so unnecessarily suggestive and conducive to irreparable mistaken identification'' that the defendant was denied due process of law. (*Stovall* v. *Denno*, 388 U.S. 293, 302 [18 L.Ed. 1199, 1206, 87 S.Ct. 1967]; *People* v. *Caruso*, 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336].) The danger of unfair suggestion can be present where the identification procedure used is the presentation of photographs of possible suspects to the witness. (*People* v. *Pedercine*, 256 Cal.App.2d 328, 336 [63 Cal.Rptr. 873].)

A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police. Tested by this standard, the method used by Officer Perkins to procure the identification of defendant was fair as to Peggy, but unfair as to Sandra. The officer did not draw a beard on defendant's photograph until Peggy had first selected it as most closely resembling the man she had seen in the park. Since none of the men in the photographs had beards Peggy could not be positive that defendant was the man. Officer Perkins wanted to ''help'' Peggy to make a more positive identification. To be completely fair she should have sketched beards on all of the photographs; instead she drew a beard only on defendant's picture. While this procedure was

at some 25, 30 feet you saw a man with a beard, in looking at the gentleman sitting on my left, is this the man? A. I am not sure. Q. You are not sure? A. No. Q. Do you feel that perhaps more than likely he is not the man? A. I would say that there is about a 50-50 chance. Q. But there is that much doubt, 50-50? A. Yes.''

unfair to the extent that it tended to confirm the identification already made by Peggy, the unfairness did not produce the identification in the first instance, and so cannot be considered as ground for a claim of denial of due process of law. On the other hand, when Officer Perkins showed the photographs to Sandra, the beard was already drawn in on defendant's picture. There could be no doubt in Sandra's mind which man Officer Perkins suspected and therefore the identification by Sandra was procured by unfair means.

Whether the identification technique employed in a given case violates due process of law "depends on the totality of the circumstances surrounding it." (*Stovall* v. *Denno, supra,* 388 U.S. 293; 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]; see *People* v. *Feggans,* 67 Cal.2d 444, 448-449 [62 Cal.Rptr. 419, 432 P.2d 21].) In *Stovall* v. *Denno, supra,* the defendant was shown to the victim of a stabbing in the hospital where the victim was confined for major surgery to save her life. While noting that the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup has been widely condemned, the Supreme Court concluded that the showing of the defendant to the victim in an immediate hospital confrontation was imperative because the victim was in danger of dying and was the only person who could exonerate the defendant. In the record before us no circumstances are revealed which justify the showing to Sandra of a photograph of the defendant with the beard drawn on it. Before going to Sandra's school, Officer Perkins should have obtained an unmarked photograph. Her failure to do so violated defendant's right to due process of law.

However, the error does not require reversal because it is our belief that it was harmless beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) The probative effect of the pretrial identification by Sandra was weakened by her testimony at the trial. It therefore seems unlikely that the error contributed significantly to the conviction. Our belief is confirmed by the closing remarks of the judge to whom the case was tried to the effect that he did not rely heavily upon the identification by the girls. There is other relevant evidence tending to prove that defendant was the man in the park. Evidence that Peggy had identified the defendant at the preliminary hearing was independent evidence of identity. (*People* v. *Gould,* 54 Cal.2d

621, 626 [7 Cal.Rptr. 273, 354 P.2d 865].)[2] Defendant was proved without contradiction to have been the registered owner of the car in which the man was sitting and to have worn a beard at the time. A consciousness of guilt can reasonably be inferred from his action in shaving off his beard shortly after the time of the incident in the park.

The defense testimony did not create a conflict in the evidence. Defendant did not testify, but his wife and mother-in-law testified respectively that defendant left his home at 6:30 p.m. and arrived at his mother-in-law's home at 7:30 p.m. The incident in the park took place sometime between the hours of 5:30 and 8 p.m. The defense testimony did not establish where defendant and his mother-in-law lived in relation to the park; there was no evidence to indicate that defendant could not have had time to visit the park on the way from his home to that of his mother-in-law. Furthermore, defendant's wife and mother-in-law were impeached to some extent by evidence that defendant's wife had told a police officer that she did not know whether or not her husband had been playing baseball on the night of the crime, whereas both women testified that defendant had told them that he was going to Sears, a store.

Defendant contends that Officer Perkins also acted unfairly when, some time after Peggy and Sandra had picked out defendant's picture as most resembling the man in the park, she told them that defendant had committed a prior similar offense and was in need of psychiatric help. The girls testified that Officer Perkins said this before the preliminary hearing while Officer Perkins testified that she imparted this information to the girls after the preliminary hearing after she had received from the district attorney a copy of a letter written by defendant's attorney stating that the girls' family had told defendant that the girls were not sure whether defendant was the man in the park or not. Since we are bound to resolve all conflicts in the evidence in favor of the judgment, we must assume that the trial judge accepted the testimony of Officer Perkins on this factual issue. (*People v. Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911]; *People v. Williams,* 164 Cal.App.2d 285, 287 [330 P.2d 942].) Her statement was made apparently to persuade the girls to hold

[2]The trial commenced prior to January 1, 1967 and therefore the Evidence Code does not apply (Evid. Code, § 12, subd. (b).) The same result would obtain, however, under the Evidence Code (§§ 770, 785, 1235, 1238).

to their identification of defendant. Having been made after the girls had already identified defendant, her statement cannot be said to have unfairly produced that identification.

■ The foregoing discussion disposes of defendant's contention on appeal that the evidence was insufficient to support the judgment. At the very least, the testimony of Peggy and Sandra showed that defendant resembled the man in the park. The identification of defendant's car and his conduct in shaving off his beard shortly after the incident were independent circumstantial evidence of guilt.

■ Defendant complains that the court improperly sustained an objection to the following question asked of Sandra by defense counsel: "Would you feel, if I ask you the question, of your own feelings or accord that you were encouraged to select this man? Would you feel that perhaps Mrs. Perkins encouraged you to go along and indicate and testify that this is the man even though you weren't positive?" The court sustained the objection on the ground that the question called for a conclusion and then stated, "You are entitled to bring out everything that happened in that conversation. The court must conclude as to whether or not it was encouraging or otherwise. . . ." Sandra's state of mind at the time she selected defendant's photograph was not an issue in the case. The trial court gave to defense counsel an opportunity to rephrase the question; defense counsel declined to do so. The objection was properly sustained on the ground stated by the court.

### The mentally disordered sex offender proceedings did not meet statutory requirements.

■ The trial court found defendant to be a probable mentally disordered sex offender and committed him for observation and diagnosis to Atascadero State Hospital. After spending five months at Atascadero, defendant was returned to the court for further proceedings. Probation was denied and he was sentenced to state prison. The court did not comply with any of the procedural requirements of sections 5500 et seq. of the Welfare and Institutions Code concerning mentally disordered sex offender proceedings. The failure to so comply resulted in a denial of due process of law and requires that the judgment be reversed in part. (*People* v. *Succop,* 67 Cal.2d 785 [63 Cal.Rptr. 569, 433 P.2d 473]; *People* v. *Harvath,* 251 Cal.App.2d 780 [60 Cal.Rptr. 15].)

. The record does not show that defendant expressly waived the procedural requirements for commitment as a mentally

disordered sex offender.[3] No waiver of defendant's constitutional rights can be presumed from the fact that he was represented by counsel at the time he was committed to Atascadero State Hospital and when he was sentenced. (*In re Jones,* 61 Cal.2d 325, 329-330 [38 Cal.Rptr. 509, 392 P.2d 269]; *People* v. *Harvath, supra,* 251 Cal.App.2d 780; *People* v. *Loignon,* 250 Cal.App.2d 386 [58 Cal.Rptr. 866].)

▉ It cannot be argued that the matter is moot because defendant is no longer confined to the Atascadero State Hospital. A similar contention was answered as follows in *People* v. *Succop, supra,* 67 Cal.2d 785 at p. 790, "However, had defendant been given an opportunity to cross-examine the court-appointed psychiatrists and to produce evidence in his own behalf, the trial court conceivably might have found that there was not probable cause for believing him to be a mentally disordered sex offender. Such a finding would be relevant to the question whether probation should be granted. . . . Furthermore, defendant is entitled to the opportunity to clear his name of the adjudication that he is a probable mentally disordered sex offender."

The order committing defendant to Atascadero State Hospital and the order denying probation are vacated. The judgment of conviction is reversed insofar as it commits defendant directly to imprisonment in a state prison and is otherwise affirmed. Defendant is ordered returned to the superior court for a hearing to determine if there is sufficient cause to believe him a mentally disordered sex offender and for such further proceedings as the trial court deems proper under sections 5511.7 and 5512 of the Welfare and Institutions Code.

Ford, P. J., and Cobey, J., concurred.

---

[3]In argument at the time of sentencing, defense counsel stated: "Mr. Slutts, I might again add, has already spent five months at the hospital, as opposed to the three months which he was previously sent to on his own accord on this." This statement cannot be said to constitute a record that defendant expressly waived his rights to a hearing. The record does not show that defendant was advised of his right to a hearing as required by section 5503 of the Welfare and Institutions Code.