503 P.2d 777

STATE of Arizona, Appellee,

v.

Billy Ray ALEXANDER, Appellant.

No. 2230.

Supreme Court of Arizona,
In Division.

Nov. 30, 1972.

Gary K. Nelson, Atty. Gen., William P. Dixon, Mary Z. Chandler, Asst. Attys. Gen., Phoenix, for appellee; Joel J. Finer, College of Law, University of Arizona, Tucson, of counsel.

Clay G. Diamos, Tucson, for appellant.

LOCKWOOD, Justice.

At 2:45 a. m. on November 26, 1969, two men entered the lobby of the Tidelands Motor Inn in Tucson. One, who was tall and wearing a "Fu Man Chu mustache," went into the men's restroom. The second man approached the night desk clerk, Steven Kasai, asked about accommodations, and then entered the restroom. Ronald Battleson, a night porter at the Tidelands, observed the two men enter the lobby and the activities that transpired. When the two men emerged from the restroom, they were armed with guns. The taller man now wore a handkerchief over his mouth and he stated, "This is a robbery." Kasai and Battleson were ordered to lie on the floor with their faces down. Before fleeing, the robbers took the cash drawer and Kasai's billfold and ring.

Several months later, following a police investigation, defendant Billy Ray Alexander and another man were charged with

the armed robbery, a violation of A.R.S. §§ 13-641, 13-643, subsec. B. Alexander pled not guilty and was tried alone. He presented an alibi but was convicted by a jury and sentenced pursuant to Arizona's Recidivist Statutes to from fifteen to twenty years in prison. He appeals, raising several questions for review.

## "DID THE TRIAL COURT ERR IN PERMITTING THE USE OF THE TRANSCRIPT OF PRELIMINARY HEARING TESTIMONY OF MR. KASAI, A VICTIM OF THE ROBBERY?"

At some time subsequent to the robbery, Kasai moved from Tucson to California. He returned to Tucson, however, to testify at Alexander's preliminary hearing on February 20, 1970. On the morning of August 25, 1970 (several hours before Alexander's Superior Court trial was to begin), the prosecutor filed a motion for continuance on the ground that Kasai could not be located. Supplementing this motion was an affidavit by the prosecutor that Kasai was "on business" in Florida. The affidavit further stated that the prosecutor had personally telephoned Mrs. Kasai in Anaheim, California, and that:

"she does not know Mr. Kasai's whereabouts in the State of Florida, that Mr. Kasai has informed her that he will call her when he intends to leave Florida, and that until he calls she has no idea of where Mr. Kasai is located in Florida. Further, that I have been informed by Mrs. Kasai that as soon as she is contacted by Mr. Kasai she will call me and

have Mr. Kasai call me. Furthermore, in the past both Mr. Kasai and Mrs. Kasai have both been extremely cooperative with the State of Arizona in this matter, and I have every reason to believe that Mr. Kasai, at the present time, cannot be located by his wife in Florida."

The motion for continuance was argued orally before the court on the same morning. The prosecutor stated that:

"I have made several phone calls to her [Mrs. Kasai]. She has told me that she will call me as soon as she hears from her husband. I called her back and she hasn't heard from her husband yet. Yesterday was the last day I called her. I received no calls last night or this morning from her. And she just, according to her, does not know where he is in Florida until he calls."

Defense counsel argued that while he opposed a continuance on the ground of Alexander's right to a speedy trial, he also opposed the alternative solution of introducing in evidence at trial the transcript of Kasai's testimony at the preliminary hearing, because it would violate Alexander's right to have a face to face confrontation with the witnesses against him. After questioning by the court, defense counsel acknowledged that were Kasai present at the trial his testimony would probably be "substantially the same" as the testimony Kasai had given at the preliminary hearing. On the basis of defense counsel's acknowledgment of this fact, the trial court, pursuant to Arizona Rule of Criminal Procedure 246,[1] 17 A.R.S., denied the motion for continuance and granted

1. Ariz.R.Crim.P. 246: "If good cause is shown for a continuance on the ground that a witness is absent, the court shall nevertheless refuse the continuance if the adverse party will admit that the witness if present would testify to the facts set forth in the application, except that the court, if it is of the opinion that the action cannot be tried with justice to the applicant by such admission, may require the adverse party to admit the truth of the testimony as a condition of refusing to grant the continuance. If the

court refuses to grant the continuance by reason of either admission by the adverse party, the party applying may read to the jury the facts expected to be proved as alleged in the application, so far as they are relevant and competent. If the admission by the adverse party is simply that the absent witness would testify as alleged, the adverse party may contradict or impeach this testimony or impeach the witness as if the witness were present."

permission to the state, over defense objection, to introduce the transcript of Kasai's testimony at the preliminary hearing.

■ The right of criminal defendants to personally confront the witnesses against them is historically well-established and explicit. The Sixth Amendment right of confrontation is applicable as against the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

In Barber v. Page, 390 U.S. 719 at 724–725, 88 S.Ct. 1318 at 1322, 20 L.Ed.2d 255 at 260 (1968), the United States Supreme Court stated that " * * * a witness is not 'unavailable' [to testify in person] unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial."

The Arizona Constitution, art. 2, § 24, A.R.S., also grants this right of confrontation.

To implement the stringent standard of the Arizona Constitution, A.R.S. § 13–161 provides that:

"In a criminal action defendant is entitled:

"1. To have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed.

"2. To have counsel.

"3. To produce witnesses on his behalf, and *to be confronted with the witnesses against him in the presence of the court, except that the testimony or deposition of a witness may be received in evidence at the trial as by law prescribed."* (Emphasis added.)

The Arizona Rules of Criminal Procedure also recognize the right of confrontation. Rule 23 states that "all witnesses [at a preliminary hearing] shall be examined in the presence of the defendant and may be cross-examined." However, Rule 30(B) provides that:

"B. When a witness has been examined as provided in Rule 23 and his testimony taken as provided in Rule 28

[i. e., reduced to writing by the magistrate or taken, transcribed, and certified by a court reporter], such testimony may be admitted in evidence upon the trial of the defendant for the offense for which he is held, either on behalf of the state or the defendant, *if for any reason the testimony of the witness cannot be obtained at the trial* and the court is satisfied that the inability to procure such testimony is not due to the fault of the party offering it." (Emphasis added.)

Defendant Alexander does not now argue that the denial of the state's motion for continuance was error. Rather, his claim is that the trial court abused its discretion in allowing witness Kasai's preliminary hearing testimony to be read to the jury. We agree that the latter procedure constituted an abuse of discretion—despite the defendant's objection to a continuance.

In Valuenzuela v. State, 30 Ariz. 458, 248 P. 36 (1926), this Court held that the issuance of a subpoena for a missing witness coupled with an affidavit by a deputy sheriff that he had been unable to find the witness but believed him to be in Nevada, was *insufficient to justify the admission of the transcript.* Judge Henry Ross wrote that:

"[B]efore the testimony of a witness upon a previous trial can be used [pursuant to § 1052 of the Penal Code of 1913, a statutory predecessor to the present Ariz.R.Crim.P. 256, which allows testimony recorded in a court of record to be read at a subsequent trial or proceeding in the same action], it must be made to appear by competent evidence that such witness is either dead or beyond the jurisdiction of the court. The preliminary fact, whichever it may be, must be shown to exist. It is not sufficient to show simply that the witness had testified in a prior trial, and that his testimony had been stenographically reported.

\* \* \* \* \* \*

"By the common law it was absolutely essential 'that the preliminary proof of the facts permitting the use of the secondary evidence should be established by competent evidence, and, as we conceive it, the same rule should, and does, apply under section 1052 * * *." 30 Ariz. at 461, 462, 248 P. at 37, 38.

The opinion then cited a California case in which a woman signed an affidavit affirming that her brother, the would-be witness, was deceased. The California Supreme Court held that

"The evidence introduced to show the death of the witness was as much a part of the trial as any other part of it, and the fact that the witness was dead could no more be shown by affidavit than the fact that dying declarations could be 'shown by affidavit to have been made under the sense of impending death, or that the contents of a written document could be shown, supplemented by an affidavit to the effect that the document was lost. The statute says the fact of death must be satisfactorily shown to the court. [People v. Plyler, 126 Cal. 379, 58 P. 904 (1899).]" 30 Ariz. at 463, 248 P. at 38.

Judge Ross of this Court then noted that:

"While section 1052, supra, does not provide that the foundation for the use of the testimony shall be satisfactorily shown to the court, that, no doubt, is the right rule, and it means it must be shown by competent evidence.

*        *        *        *        *        *

"We are of the opinion the court erred in permitting the deposition to be read over the objection of the appellant.

"It only remains to determine whether the testimony thus read to the jury was prejudicial to appellant's rights. We think there can be no question about that." 30 Ariz. at 463–465, 248 P. at 38–39.

In Sam v. State, 33 Ariz. 383, 265 P. 609 (1928), involving facts quite similar to those in the instant case, this court re-affirmed the rule promulgated in the *Valuenzuela* case, *supra*:

"We think the rule laid down in the Valuenzuela Case is the one to apply in this. While the statute in question states that the witness must be shown by the return of the sheriff on a subpoena duly issued to be out of the jurisdiction of the court, such subpoena is merely preliminary evidence, and not conclusive on the subject, and either party may supplement it by the testimony of witnesses on the stand, the ultimate test being whether the court is satisfied the witness is beyond its jurisdiction.

*        *        *        *        *        *

" * * * The purpose of requiring a return is evidently to show that a subpoena was issued and service attempted. *The ultimate test in all cases is: Does the court believe, on evidence consisting of the sheriff's return to the subpoena, and such oral testimony as is offered, that the witness is outside the jurisdiction of the court, and did the evidence reasonably support such belief?*" 33 Ariz. at 409–410, 411–412, 265 P. at 618–619. (Emphasis added.)

The court in the *Sam* case did hold, however, that the Superior Court had been presented with sufficient evidence to justify the admission at trial of the transcript of the absent witness's preliminary hearing testimony.

In McCreight v. State, 45 Ariz. 269, 42 P.2d 1102 (1935), this court wrote that:

"The showing in the present case falls far short of that which was held sufficient in the Sam Case. There a subpoena was regularly issued and return of inability to serve made thereon. In the present case it does not appear a subpoena was ever issued. In the Sam Case the sheriff himself testified as to an extended and, indeed, an unusually thorough search of the entire state, as well as his own county, for the missing witnesses, made without avail, and to the positive and unqualified statement to him, made by the son of one of the miss-

ing witnesses, that both of them were in California. In the present case there is nothing but the statement of the missing witness' sister-in-law that he was in Texas at the time of the trial. This, if unqualified, or if qualified by further testimony which showed a positive knowledge on her part of the location of the witness, might perhaps have been enough. But when her cross-examination showed that her only reason for testifying that he was in Texas at the time of the trial was, in substance, that he left her home at some indefinite but previous time intending to go there, we think it is extending the rule too far, and that it was an abuse of discretion for the trial court to admit the transcript on this showing alone. That the evidence contained in the transcript was prejudicial is shown by an examination thereof." 45 Ariz. at 273–274, 42 P.2d at 1103.

In State v. Head, 91 Ariz. 246, 251, 371 P.2d 599, 602 (1962), cert. denied, 373 U.S. 942, 83 S.Ct. 1550, 10 L.Ed.2d 697 (1963) we stated that "A return of the sheriff showing inability to serve a subpoena on the witness is a preliminary showing of absence, but it is not conclusive on the subject. Either party may supplement or contradict the showing. Sam v. State, *supra*."

In State v. Owens, 103 Ariz. 541, 447 P.2d 233 (1968), a subpoena had been issued for an itinerant laborer, but the witness could not be located. We approved the use of a certified transcript of the witness's testimony at a previous trial.

"It is apparent that this state is committed to the rule that the determination of whether a witness is beyond the jurisdiction of the court so that his personal attendance cannot be had is a matter within the sound discretion of the trial court. In this as in other discretionary matters we will not reverse the judgment of the trial court unless it appears that there is a palpable abuse of discretion." 103 Ariz. at 543, 447 P.2d at 235.

From the above authorities, it appears to us that in order to satisfy the requirements of the United States and Arizona Constitutions guaranteeing to a criminal defendant the right to a face to face confrontation with the witnesses against him, the prosecution must satisfy the court through competent evidence that it has made a "good-faith effort" to obtain a missing witness's presence at the trial. An affidavit of a prosecutor is insufficient to establish absence. Udall, Arizona Law of Evidence, § 182, at 411. Rather, in Arizona, a "good-faith effort" to produce a missing witness must be proven by evidence consisting of, at the very least, a subpoena which has been duly issued and returned unsatisfied, and, more desirably, of the sworn testimony of the authorities charged with the duty of serving the subpoena and of the people having knowledge of the missing witness's habits and former whereabouts, of the witness's unavailability to appear in person.

In the instant case, the only evidence presented to the court to substantiate the state's assertion that Kasai was "beyond the jurisdiction of the court" was the affidavit of the prosecutor, which was hearsay upon hearsay. No subpoena was issued in Arizona. No attempt was made to utilize the Uniform Act to Secure the Attendance of Witnesses From Without a State in Criminal Proceedings, A.R.S. §§ 13–1861 et seq., which Act is the law in both California and Florida, as well as in this state. Furthermore, Mrs. Kasai was at no time sworn and required to testify on direct or cross-examination as to her vague assertions of lack of knowledge about her husband's whereabouts.

It is noteworthy that the preliminary hearing testimony of witness Kasai which identified defendant Alexander as one of the robbers was inherently suspect because of the improper identification procedures resorted to by the police. Not only was Kasai's in person testimony needed at trial, but his presence was also necessary at the pre-trial hearing on the motion to suppress

the eyewitness identification. See discussion, *infra*. Moreover, it has recently been emphasized by the United States Supreme Court that in the context of the confrontation requirements, testimony given at a preliminary hearing ordinarily carries fewer "indicia of reliability" than testimony given at trial. *See* Mancusi v. Stubbs, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972).

It was incumbent upon the trial court to require some proof by the state that Kasai was truly unavailable to testify. Kasai and and his wife should certainly have realized, or been made aware by the prosecutor at the time of the preliminary hearing, that he would be needed to testify in person at the trial. There was, in short, no excuse for this eyewitness leaving California on an unannounced, unexplained "business trip" during the pendency of the instant criminal proceedings, without some forwarding address.

■ Criminal Rule 30(B) allows transcribed preliminary hearing testimony to be admitted at the later trial of the same cause " * * * if for any reason the testimony of the witness cannot be obtained at the trial * * *." Although, as we have stated, the decision whether to allow the transcript to be used lies within the sound discretion of the trial court, it is implicit in the constitutional rights of due process and face to face confrontation that the moving party should make an actual showing through competent evidence, sufficient to convince the court that the witness *in fact* cannot be produced.

We are therefore constrained to hold that the state did not offer sufficient proof of a good faith effort to produce Kasai at trial to justify the admission of the transcript of Kasai's testimony at the preliminary hearing. While it is true that defense counsel did grudgingly acknowledge that were Kasai to appear in person his testimony would be "substantially the same" as at the preliminary hearing, it was still necessary for the court to be firmly convinced, through a showing on the record, that the witness could not be personally present. Defendant Alexander's constitutional right

to a face to face confrontation with the witnesses against him was, in our opinion, superior to the court's power under Criminal Rule 246 to proceed with the reading of the transcript.

## "WAS THE TESTIMONY OF THE VICTIM WHO TESTIFIED PROPERLY ADMITTED IN LIGHT OF IDENTIFICATION PROCEDURES? WAS THE TRANSCRIPT?"

Four days after the robbery in question, Tucson police detectives administered separate "photograph lineups" for the eyewitnesses, Kasai and Battleson. Approximately one hundred "mug shot" photos were used. A picture of Alexander without facial hair was among the group. Kasai and Battleson both selected a picture thought to be one of the robbers, but the photograph which they selected *was not one of Alexander.*

Some time later, a second photo identification was administered for Battleson in Tucson and for Kasai in California. At the outset, each witness was told by a detective that he had selected an "incorrect" photograph at the previous identification session and that the person whose photograph was selected at the first identification session "didn't have anything to do with it [i. e., the robbery of the Tidelands]." Kasai and Battleson were each shown about 17 photos. Included in this group were several identical photos showing Alexander with no facial hair. Two of these photographs of Alexander were extraordinary, however, because they had been altered by a police artist. A conventional over-the-lip mustache had been drawn in ink on one. A mustache and goatee were inked into the second. (See appended exhibit). None of the other 15 photographs in this group had been altered, and there was only one photo of each of the other men. Kasai and Battleson selected one of the pictures of Alexander, but the record is not clear which photos of Alexander were selected. Following the selection, the detective "asked [Kasai] if he saw the same, the same picture in the other, in the rest of the group.

And at this time he [answered] no." The detective then picked up the unretouched photo of Alexander and asked, "Is this the same person?" Kasai said, "Yes, I guess it was."

After Battleson selected one of the photos of Alexander the following transpired, according to the testimony of Detective Angeley:

> "He [Battleson] said, 'This is the man,' he says, 'It looks like him.' At this time I told him to look at any of the other pictures and see if he could see the same man. And at this time he could not—I picked up the other picture of Billy Ray and showed it to him, and he said, 'Yes, this is the man.'"

At the conclusion of the second photo identification sessions, both witnesses were told that they had selected the "correct" pictures. Thereafter at the preliminary hearing, Kasai identified Alexander as one of the robbers.

On the morning of August 25, 1970, just prior to Alexander's trial, the Superior Court judge held a hearing as prescribed in State v. Dessureault, 104 Ariz. 380, 453 P.2d 951, supplemented 104 Ariz. 439, 454 P.2d 981 (1969), cert. denied, 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970), to determine whether the proposed in-court trial identifications of Alexander (by Battleson in person and by Kasai through the reading of the transcript of Kasai's preliminary hearing testimony) would be admissible in view of the pre-trial identification procedures utilized by the police. At the conclusion of the *Dessureault* hearing, the judge made the following rulings:

> "Gentlemen, after reviewing the Dessureault case and the evidence in this case, it appears to me that the prosecution has failed to establish by clear and convincing evidence that the pre-trial identification was not unduly suggestive. However, the evidence does appear to me to be clear and convincing that the

proposed in-court identification [made by Kasai at the preliminary hearing] and the in-court identification made today here by Mr. Battleson is not tainted by any prior identification.

\*    \*    \*    \*    \*    \*

> "After having read both transcripts [of the preliminary hearings held for Alexander and his co-defendant], \* \* \* my finding, gentlemen, at this time is that, well, with regard to the witness Kasai, is the same as it was with respect to the in-court identification of the witness Battleson; that is, with regard to both witnesses the state has failed to establish by clear and convincing evidence that the circumstances of the pre-trial identification were not unduly suggestive. However, it's a further finding of the court that, or I should say, from the clear and convincing evidence that *the proposed in-court identification of the Defendant Alexander by both Battleson and Kasai is not tainted by any prior or pre-trial identification procedures*; it does not appear to me that there is any taint whatsoever with respect to those procedures and the in-court identification."

At trial, Battleson identified Alexander as being one of the robbers, and the transcript of Kasai's identification by Alexander at the preliminary hearing was read to the jury. (At trial, Alexander wore a conventional over-the-lip mustache, not a "Fu Man Chu mustache.").

Alexander now argues that the in-court testimony of Battleson at trial and the transcript of Kasai's testimony at the preliminary hearing were inadmissible because of the circumstances of the "photo lineup."[2]

■ Both of the photo identification sessions in question occurred prior to an information being filed against Alexander on March 19, 1970. As we stated in State v. Dessureault, *supra*, and in State v.

---

2. Alexander does not now argue that he was entitled to counsel at the photo identifications, as was argued in State v.

Yehling, 108 Ariz. 323, 498 P.2d 145 (1972).

Lang, 107 Ariz. 400, 489 P.2d 37 (1971), the *Wade* and *Gilbert* decisions are not controlling where an in-court identification based upon a pre-information photo identification, is challenged. Rather:

> "[o]ur determination of the merits of [such a] case is controlled, as in *Dessureault, supra*, by Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The test, as noted in *Stovall, supra*, is as follows:
>
> > '* * * [A] claimed violation of due process of law in the conduct of a confrontation depends on the *totality of the circumstances surrounding it * * *.*' 87 S.Ct. at 1972. (Emphasis added.)"

107 Ariz. at 403, 489 P.2d at 39–40.

The Stovall test is further implemented by Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968):

> "* * * [W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph *will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.*" 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253 (Emphasis added.)

▮ After studying the record of this case, we agree with the Superior Court

judge that the pre-trial photo identifications of Alexander were illegal. The blunt technique of drawing facial hair onto the photos of Alexander—and only on the photos of Alexander—coupled with the commentary of the police detective that the witnesses had first selected the wrong photo but that they later had selected the "correct" photo, constituted a procedure which was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons, supra.*[3] See also People v. Slutts, 259 Cal.App.2d 886, 66 Cal.Rptr. 862 (1968). " * * * [I]dentification [may not be] secured by a process in which the search for truth is made secondary to the quest for a conviction." Palmer v. Peyton, 359 F.2d 199 (4th Cir. 1966).

The questions which we must here resolve are whether the trial court properly found, pursuant to *Dessureault, supra*, that the prosecution had proved from clear and convincing evidence that the proposed in-court identifications were not tainted by the prior photo identifications, and, in the event that the proposed in-court identifications *were* tainted, whether said taint was harmless.

The record shows that the eyewitnesses Kasai and Battleson did not have the clearest memories of the physical characteristics of the robbers they had seen on the night the crime was committed. In fact, about the only characteristics ever used to describe the taller robber (later al-

---

3. As noted by the United States Supreme Court in *Simmons v. United States, supra:* "It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." 390 U.S. at 383–384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.

leged to be Alexander) were that he was a black man, he was the taller of the two robbers, and he wore a "Fu Man Chu mustache." The following excerpts from the transcript of the *Dessureault* hearing are illustrative of the defects in the testimony identifying Alexander as one of the robbers:

[Direct examination of Battleson:]

"Q. And for how long did you see him [the taller robber]?

"A. Oh, a good, a good five minutes.

＊ ＊ ＊ ＊ ＊ ＊

[Battleson then related how the robbers went into the restroom during the moments just prior to the robbery.]

"Q. ＊ ＊ ＊ And when he came back out, this is when he had the mask, is that correct?

"A. A mask, a handkerchief across the lower part of his face covering the mustache, and a gun in his hand here (indicating).

"Q. Did you get a good look at him at this time?

"A. I could just see his eyes, because this is the first time I really had faced him.

＊ ＊ ＊ ＊ ＊ ＊

"Q. Now, how good a look did you get at the taller of the two men at the Tidelands before you were asked to lie on the floor?

"A. Oh, I got a very good look at him, when he was at an angle from me, because I kept my eyes glued on this mustache, because this is what attracted me to his face ＊ ＊ ＊.

＊ ＊ ＊ ＊ ＊ ＊

[Battleson then testified on cross-examination concerning the circumstances of the first photo identification.]

"Q. What was the racial distribution of the pictures he showed you?

"A. I didn't get you.

"Q. Were they all Negro or were they all Caucasian or what?

"A. No, they were all Negro. They were all colored pictures.

"Q. Okay. And at that time did you identify any of the pictures?

"A. Yes, I identified one, one.

"Q. And what did that picture show, if you can remember?

"A. It showed a fellow who had the type of mustache that the fellow had that night. And the hair, the same kind of, the same way he had his hair worn and everything. This is all I can remember about the picture, ＊ ＊ ＊.

＊ ＊ ＊ ＊ ＊ ＊

[On redirect examination, Battleson was asked the following:]

"On the first date that you viewed the pictures, Mr. Battleson, did you positively identify the picture you [apparently incorrectly] picked out as being the suspect?

"A. Yes, sir.

"Q. Well, by positively, what I mean is, did you say that this is the man that was in there, or did you say that this looks like the man that was in there?

"A. This looks like it, the man that was in there, because of his mustache, and everything.

＊ ＊ ＊ ＊ ＊ ＊

"Q. Okay, and now, the second time you viewed pictures, were you told before viewing those pictures who you were looking for.

"A. Yes, I believe so.

"Q. Were you given his name?

"A. Yes, because the detectives told, told us that we had picked the wrong man the first time ＊ ＊ ＊.

* * * * * *

"Q. Now, Mr. Battleson, today in court where you identified Mr. Alexander, the defendant, are you identifying him here in court because of the pictures you saw or are you identifying him because you remember him looking like he does here?

"A. Well, I am remembering him, he looks the way, the way he looks here too, not of the pictures of the other, of the other way you said there.

"Q. Did the pictures particularly look like he does here today?

"A. No, the pictures I saw of him he had hair, he wasn't bald or anything like that, no.

"Q. Okay, I will ask you again, are you positively sure that this is the same man?

"A. Yes, I am."

The witness Kasai admittedly made a more positive identification of Alexander at the preliminary hearing than Battleson did at the hearing required by *Dessureault*. But Kasai was present neither at trial nor at the hearing, and thus was never examined in detail as to the source of his in-court identification of Alexander at the preliminary hearing.

Viewing the "totality of circumstances" surrounding the pre-trial and trial identifications, it is apparent that (1) as for the witness Battleson, the prosecution did *not* sustain its burden of proving from clear and convincing evidence that the proposed in-court identification was not tainted by the prior photo identification, and that the prosecution failed to show by clear and convincing evidence that the proposed in-court identification would be based upon anything other than Battleson's memory of Alexander sitting behind the defense table at the preliminary hearing. (2) As for the witness Kasai, the trial court was simply not presented with clear and convincing evidence (or with *any* evidence) upon which it could make a finding that the pre-

liminary hearing identification of the defendant by Kasai was not tainted by the illegal photo identification.

Thus, both Kasai's and Battleson's testimony identifying Alexander as one of the robbers should have been excluded from the evidence presented at trial.

The State makes the following argument on appeal: "Assuming arguendo that there was taint, nevertheless from the copius independent evidence of guilt it is clear that even absent [Kasai's and Battleson's] in-court identification[s] no reasonable jury could have acquitted defendant. For this reason the error was harmless."

The most recent refinement by the United States Supreme Court of the concept of harmless error is found in Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed. 2d 340 (1972). In that case, the Court stated that:

"[U]nless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710 (1967). In this case, we conclude that the 'minds of an average jury' would not have found the State's case significantly less persuasive had the [incompetent] testimony as to Snell's admissions been excluded. The admission into evidence of these statements, therefore, was at most harmless error." 405 U.S. at 432, 92 S.Ct. at 1060, 31 L.Ed.2d at 345.

We have no hesitation in finding that the in-court eyewitness identifications of Alexander by Kasai and Battleson contributed to Alexander's conviction. Moreover, we believe that the average jury would have found the state's case less persuasive had the in-court eyewitness identifications been excluded. The clear and manifest error committed by the trial court of permitting the introduction into evidence of the in-court identifications was unquestionably harmful, and therefore reversible.

Because there will be a new trial of this case, we find it necessary to dispose of several issues raised by Alexander and which will be relevant at the new trial.

.**"COULD THE DEFENDANT BE CONVICTED OF ROBBERY WHILE ARMED WITH A GUN IN THE ABSENCE OF PROOF THAT THE GUN APPARENTLY USED IN THE ROBBERY WAS, IN FACT, LOADED?"**

The evidence presented at trial clearly proved that the robbery of the Tidelands Motor Inn was committed by two men, at least one of whom carried a pistol. Both Kasai and Battleson testified that one of the robbers warned the two victims that if they did not cooperate, "I will shoot." The state apparently acknowledges on appeal that the prosecution made no showing at trial to prove that the gun(s) assertedly used by the robbers was (were) loaded at the time of the robbery.

"* * * [O]ne of the essential elements [of a robbery as defined in A.R.S. § 13–641] is the use of force or the putting in fear—in this case, the pointing of the pistol at the robbery victim." State v. George, 108 Ariz. 5, at 7, 491 P.2d 838, at 840 (1971). "The gist of the armed robbery is the force or intimidation used in taking another's property against his will." People v. Burns, 403 Ill. 407, at 408, 86 N.E. 2d 197, at 198 (1949). It is the mere brandishing of a firearm or other deadly weapon which puts a robbery victim in fear for his life and which usually allows a robber to perpetrate his crime with the victim justifiably not even attempting to interfere.

Moreover, A.R.S. § 13–643, subsec. B, which prescribes the punishment to be imposed upon a conviction for armed robbery, is written in the disjunctive: "* * * gun or deadly weapon * * *." Although a gun can be a deadly weapon, the statute requires only a gun and there is no requirement that it be loaded. *See* State.v. Mitchell, 106 Ariz. 492, 496–497, 478, P.2d 517, 521–522 (1970). *Se also*, People v. Kelly, 168 Cal.App.2d 387, 335 P.2d 955 (1959).

We therefore hold that in this case, the prosecution's evidence against Alexander was not defective because of the failure to prove that the gun assertedly used by Alexander at the time of the robbery was, in fact, loaded.

**"WAS IT AN ABUSE OF DISCRETION TO PERMIT THE PRIOR FELONIES TO BE FILED?"**

Thirteen days prior to defendant Alexander's trial, the state filed a motion for leave to file an addendum to the information. The addendum sought to show that Alexander had previously been convicted of two felonies in Arizona, so that his sentence for the instant armed robbery would be automatically increased by the operation of Arizona's recidivist statute, A. R.S. § 13–1649. A hearing on the motion was held, at which time defense counsel protested that the prosecution had not provided him with information concerning the two prior felony convictions. At the hearing, the Deputy County Attorney pointed out to the Superior Court judge that earlier that day, defense counsel had been given copies of all the documents and information pertaining to Alexander's prior convictions, with the exception of certain "mug shots" of Alexander and a prison "print card," the latter items being difficult to reproduce on a Xerox machine. The prosecutor stated that a copy of the photos and the print card would be given to defense, if requested by him. The judge read aloud § 13–1649, subsec. C, which provides that the court in its discretion may allow the allegation of a prior conviction at any time prior to trial, if, when the allegation is filed, the state makes available to the defendant a copy of any material or information obtained concerning the prior conviction. Concluding that the prosecution had fully complied with this statute, the

court granted the motion for leave to file the addendum to the information.

On appeal, we are uncertain of the exact thrust of defendant's argument. There is no indication in the record whether defense counsel requested that the "mug shots" and the "print card" be supplied to him, or that they were not in fact supplied to him as soon after the hearing as was possible. Moreover, the "mug shots" and "print card" were "available" to defense counsel in the case file in the Superior Court Clerk's Office—and defense counsel acknowledged this fact at the hearing. As was pointed out by the trial court during the above hearing, § 13–1649 does not require the state to make anything available to the defense *before* the motion is granted. Defendant on appeal makes no showing of prejudice as a result of these occurrences and we have discovered none. Furthermore, no question has been raised as to the sufficiency of the proof of the prior convictions inasmuch as defendant admitted them both on cross-examination.

We therefore hold that there was no abuse of discretion in granting the state's motion for leave to file an addendum to the information.

"WAS IT PROPER FOR THE STATE TO CALL A FORMER ATTORNEY OF THE DEFENDANT IN PROVING THE PRIOR FELONIES ALLEGED IN THE ADDENDUM TO THE INFORMATION?"

■ After the jury returned its verdict of guilty of the instant charge of armed robbery, the jury heard evidence concerning defendant Alexander's prior convictions. During this stage of the proceedings, Alexander's former attorney, a Deputy Pima County Public Defender, was called by the State to identify Alexander as being the same individual who had been convicted of the prior felonies. Alexander argues that this violated the attorney-client privilege owned by Alexander in connection with his prior representation by that Deputy Public Defender.

■ A.R.S. § 13–1802 provides that

"A person shall not be examined as a witness [in a criminal prosecution] in the following cases:

\* \* \* \* \* \*

"2. An attorney, without the consent of his client, as to any communication made by the client to him, or his advice given thereon in the course of professional employment."

As stated in Udall, Arizona Law of Evidence § 94, at 148, "The privilege extends only to confidential *communications* between the client and his attorney. Thus, the fact that the client has consulted an attorney, the dates and places of his visits, the *identity of the client,* and similar matters are outside the coverage of the privilege." (Emphasis added.) In the instant case, Alexander's former lawyer was examined for identification purposes only. Therefore, the privilege was not violated.

The attorney-client privilege exists for the reasonable purpose of encouraging clients to confide in their lawyers all information which may be necessary to their effective legal representation. To the extent that the privilege applies in any particular case, justice is necessarily (and justifiably) hampered. Were we to accept Alexander's argument on this issue and exclude testimony by lawyers as to non-confidential information concerning their clients, justice would be *further* hampered by the exclusion of valuable evidence—and for no compelling purpose.

The judgment is reversed and the cause is remanded for a new trial consistent with this opinion.

HAYS, C. J., and STRUCKMEYER, J., concur.

APPENDIX

## PHOTO "3-a"

 

## PHOTO "3-b"

 

PHOTO "3-g"