Filed 6/17/14  P. v. Shipman CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063388 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD239448) |
| CHARLES EDWARD SHIPMAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

Charles Edward Shipman appeals a judgment following his jury conviction of one count of attempted robbery (Pen. Code, §§ 664, 211)[1] and three counts of robbery (§ 211). On appeal, Shipman contends the trial court erred by: (1) denying his motion to exclude pretrial identifications by two witnesses he contends were the result of unduly suggestive procedures and their resulting tainted in-court identifications; (2) refusing to instruct with his pinpoint instruction that the pretrial identification procedures were unduly suggestive; and (3) instructing the jury with CALCRIM No. 315, which included the certainty of the witness's identification as a credibility factor. He also contends he was denied his constitutional right to effective assistance of counsel when his counsel did not object to the trial court's CALCRIM No. 315 instruction.

FACTUAL AND PROCEDURAL BACKGROUND

In October 2011, John Lux worked as a restaurant parking lot attendant in the Hillcrest neighborhood of San Diego. At about 5:00 p.m. on October 23, while it was still daylight, Shipman approached Lux and asked him for a light. Lux handed him some matches. Shipman complained that his car had been towed from across the street. Lux gave him the police telephone number and Shipman appeared to make a call on his cell phone. After his call, Shipman remained in the parking lot and talked to Lux. He told Lux that he was a Marine stationed at Camp Pendleton and worked with munitions. Shipman stated there were munitions in his car and that he had a firearm on him. About 20 to 25 minutes later, Shipman walked away.

---

[1]     All statutory references are to the Penal Code unless otherwise specified.

At about 8:00 p.m., Shipman suddenly reappeared next to Lux, shocking him. Shipman stated, "Give me the money," then reached inside Lux's left front pocket and took $150. Shipman had seen earlier where Lux kept his money. Lux recognized Shipman from his conversation with him earlier that evening. Shipman ordered him to lie face-down on the ground, and Lux complied. After Shipman left, Lux went into the back of the restaurant and told someone he had been robbed. A man called 911 for him.

At about 6:30 p.m. on December 16, 2011, Shipman returned to the same parking lot and again robbed Lux while he was working. Shipman stated: "Give me the money," and reached inside Lux's pocket where the money had previously been located. However, Lux no longer kept his money in this pocket. Shipman put his hand in his jacket pocket, gestured as if he had a gun, and said that he would shoot Lux if he did not give him the money. Lux took money from a box in the attendants' booth and handed about $50 to Shipman. When Shipman asked him whether there was more money or whether he had a wallet, Lux replied, "No." Shipman told Lux to lie face-down as before. Later, during a 911 call, Lux reported the same person who robbed him on October 23 had robbed him again.

At about 7:00 p.m. on December 16, Katilee Fender was working as a clerk at a store in the North Park neighborhood of San Diego. She was closing the store when Shipman walked in. She told him the store was closed and he replied, "Good. This is a robbery. Give me all the money in the register." He gestured with his hand in his pocket and told her he had a gun and would shoot her if she looked at him. Fender gave him the money from two registers. Shipman demanded the money in the boxes on the floor,

3

came around the counter, and pointed to the boxes. Shipman told her: "Don't look at me. Give me the money. I'll kill you." Fender opened the boxes and gave him the change from the change box. She gave him more than $700. He told her to lie face-down on the floor and count to 100. After Shipman left, she got up and called 911. Fender recognized Shipman's face because he had come into the store on four to eight prior occasions and bought a single piece of incense each time.

At about 8:30 p.m. on February 13, 2012, Jessica Benjamin was working at the Five and Dime General Store in Old Town when Shipman asked her for change for a quarter. Benjamin got the register key from her supervisor, opened the register, and made the change. As she was closing the register, Shipman demanded that she give him "the money in the drawer." She replied, "no," and began to walk out from behind the counter. Shipman came around the counter and blocked her way. He had his hand in his jacket pocket and gestured as if he had a gun pointed at her. When Benjamin yelled her supervisor's name, Shipman backed away and stated, "I'm just playing you, I'm just playing." He asked for his change and she handed it to him. He then left the store. The store's video surveillance cameras recorded the attempted robbery.[2]

An amended information charged Shipman with one count of attempted robbery and six counts of robbery.[3] It further alleged Shipman had served one prior prison term

---

[2]   The parties stipulated it was Shipman shown on the surveillance video recording.

[3]   Because Shipman challenges only his three robbery convictions involving Lux and Fender (i.e., counts three, four & five), we do not describe the factual background for the other counts.

4

(§ 667.5, subd. (b), 668), had two prior serious felony convictions (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, 668). The jury found Shipman guilty on the three robbery counts involving Lux and Fender (counts three, four and five), as well as the attempted robbery count involving Benjamin (count one), but did not reach a verdict on the remaining counts. The trial court declared a mistrial on the remaining counts (counts two, six and seven) and subsequently found true the prior conviction allegations and granted the prosecution's motion to dismiss the three remaining counts. The court sentenced Shipman to a determinate term of 44 years, plus an indeterminate term of 100 years to life in prison, consisting of 25 years to life for each of counts one, three, four and five, plus an additional 11 years for each count based on the prior conviction allegations. Shipman timely filed a notice of appeal.

## DISCUSSION

### I

*Admission of Eyewitness Identification Evidence*

Shipman contends his convictions on counts three, four, and five must be reversed because the trial court violated his constitutional due process rights by denying his motion to exclude pretrial identifications by two eyewitnesses (i.e., Lux and Fender) that were the result of unduly suggestive procedures and their in-court identifications that were tainted by the unduly suggestive pretrial identification procedures. Because we conclude, based on our independent review of the record, that the pretrial identification

5

procedures were not unduly suggestive and the eyewitnesses' identifications were not unreliable, the trial court did not err by admitting the eyewitness identification evidence.

A

San Diego Police Detective Mark Haas investigated the robberies of Lux and Fender, as well as other robberies that may have been committed by the same suspect. In January 2012, he showed Lux and Fender a 10-pack photographic line-up that did not include Shipman's photograph. Neither Lux nor Fender identified anyone in that photographic line-up.

In February 2012, Haas obtained the surveillance video recording of the attempted robbery at the Five and Dime General Store in Old Town and believed the suspect in that attempted robbery matched the description of the suspects in the other robberies he was investigating. He created still photographs from the video recording and created a flyer that was distributed to law enforcement personnel for assistance in identifying the suspect shown in the photographs. Haas showed Fender the flyer displaying three photographs of Shipman from the video recording. Fender positively identified Shipman as the man who robbed her, stating, "That's him." When Haas showed the flyer to Lux, Lux stated it was too hard for him to make a determination from the photographs.[4] Haas asked Lux whether he thought viewing the surveillance video recording would help, and Lux replied it would. After viewing the surveillance video recording, Lux stated he believed the man

---

4      Two days before showing Lux the video recording, Haas obtained information that a parole agent had identified Shipman as the man shown in the flyer's photographs.

shown was the man who robbed him based on his "body style and demeanor," but that he was not positive. On a scale of one to 10, Lux's certainty that it was the same man was six out of 10.

After obtaining information that Shipman was the suspect in Benjamin's robbery, Haas created a six-pack photographic line-up that included a photograph of Shipman. Haas showed the photographic line-up to Benjamin, who immediately identified Shipman as the man who attempted to rob her.

The following day, police arrested Shipman. Shipman was wearing a black jacket similar to the one shown in the surveillance video recording of the Benjamin offense. During a search of his home, police found a gray sweatshirt in his closet. Fender identified the sweatshirt as similar to the one worn by the man who robbed her.

On March 7, 2012, police conducted a live line-up, consisting of Shipman and five other men. Lux attended the line-up and immediately identified Shipman when he walked out. His identification was confirmed when Shipman said the phrase, "Give me the money." Although Fender did not attend the live line-up, she later viewed a video recording of it and positively identified Shipman as the man who robbed her.

At Shipman's preliminary hearing, both Lux and Fender positively identified Shipman as the man who robbed them. Lux stated he was 100 percent certain of his identification.

Before trial, Shipman moved to exclude the pretrial identifications of him, arguing they were the result of unduly suggestive identification procedures. He argued the single suspect photographs and video recording, along with Haas's related statements, resulted

7

in unduly suggestive identification procedures, and therefore the pretrial identifications by Lux and Fender should be excluded. He also claimed their expected trial identifications were tainted by the impermissible identification procedures and should also be excluded. The trial court tentatively ruled it was "inclined" to grant the motion in part to exclude the pretrial identifications by Lux and Fender based on the single suspect photographs and video recording because the procedures used were "probably suggestive," but would deny the motion in part to exclude the subsequent live line-up identifications and in-court identifications by Lux and Fender, stating the live line-up appeared to be "very fair," and that under the totality of the circumstances their identifications were reliable. Based on the court's tentative ruling, Shipman elected to have all of the identification evidence admitted so his expert witness could challenge its reliability.

During trial, all of the pretrial identification evidence was admitted and Lux and Fender identified Shipman in court as the man who robbed them. They also testified regarding the robberies and their subsequent identifications of Shipman as the man who robbed them. The jury found Shipman guilty of the two counts of robbery committed against Lux and the one count of robbery committed against Fender.

B

An identification procedure is unfair if it "suggests in advance of identification by the witness the identity of the person suspected by the police." (*People v. Slutts* (1968) 259 Cal.App.2d 886, 891.) Admission of eyewitness identification evidence may violate a defendant's constitutional due process rights if the identification procedures were

8

"unnecessarily suggestive and conducive to irreparable mistaken identification . . . ."

(*Stovall v. Denno* (1967) 388 U.S. 293, 302.)  The California Supreme Court stated:

> "[T]o determine whether the admission of identification evidence
> violates a defendant's right to due process of law, we consider (1)
> whether the identification procedure was *unduly suggestive* and
> unnecessary, and, if so, (2) whether the identification itself was
> nevertheless *reliable under the totality of the circumstances*, taking
> into account such factors as the opportunity of the witness to view
> the suspect at the time of the offense, the witness's degree of
> attention at the time of the offense, the accuracy of his or her prior
> description of the suspect, the level of certainty demonstrated at the
> time of the identification, and the lapse of time between the offense
> and the identification."  (*People v. Cunningham* (2001) 25 Cal.4th
> 926, 989, italics added (*Cunningham*).)

In determining whether an identification procedure is unduly suggestive, "[t]he question

is whether anything caused defendant to 'stand out' from the others in a way that would

suggest the witness should select him [or her]."  (*People v. Carpenter* (1997) 15 Cal.4th

312, 367.)  "The defendant bears the burden of demonstrating the existence of an

unreliable identification procedure."  (*Cunningham*, at p. 989.)  The question of whether

an identification procedure is "unduly suggestive" for due process purposes is a mixed

question of law and fact that we review de novo, or independently of the trial court's

ruling.  (*People v. Kennedy* (2005) 36 Cal.4th 595, 608-609.)

C

Shipman argues the showings of the single suspect photographs to Lux and Fender

and the single suspect video recording to Lux were unduly suggestive and tainted their

subsequent identifications of him as the man who robbed them.  However, contrary to

Shipman's assertion, the showing of a single suspect photograph to a witness is not

9

inherently unfair or unduly suggestive. (*People v. Ochoa* (1998) 19 Cal.4th 353, 411-413.) "Showing the witnesses a single photo of the defendant is no more *impermissibly* suggestive than an in-court identification with the defendant personally sitting at the defense counsel table in the courtroom." (*People v. Yonko* (1987) 196 Cal.App.3d 1005, 1008-1009.) Although that single suspect identification procedure generally is not the ideal or preferred method and "may pose a danger of suggestiveness," it is not necessarily or inherently unfair. (*People v. Clark* (1992) 3 Cal.4th 41, 136.) We look at the totality of the circumstances in determining whether a particular single suspect identification procedure is unduly suggestive. (*Ibid.*)

    *Lux*. Based on our review of the totality of the circumstances of the identification procedures used in showing Lux the three photographs of Shipman on the flyer and then the surveillance video recording of the Five and Dime General Store robbery, we conclude those procedures were not unduly suggestive. Before showing Lux the photographs of Shipman, Haas told him that he had a video recording of a similar crime and wanted to show him photographs from the recording to see whether he could identify the man shown in the photographs as the man who robbed him. However, Lux could not identify Shipman as the man who robbed him based on those photographs, stating it was too hard for him to make a determination from the photographs. Haas subsequently showed Lux the surveillance video recording of that similar crime, and after viewing the surveillance video recording, Lux stated he believed the man shown was the man who robbed him based on his "body style and demeanor," but that he was not positive. On a scale of one to 10, Lux's certainty that it was the same man was six out of 10. We

10

conclude those identification procedures were not unduly suggestive. Although Lux was informed that the man shown in the photographs and video recording had committed a similar crime, he was not informed that man was believed to be the man who robbed him. Therefore, by showing the photographs and video recording of Shipman to Lux, Haas did not unduly suggest that he was the man who robbed him, but rather merely asked Lux to identify, based on his recollection, whether the man shown in the photographs was the man who robbed him. Because the identification procedures used to show Lux the photographs and video recording of Shipman were not unduly suggestive, his subsequent identifications of Shipman during the live line-up and at trial were not tainted by his prior viewing of those photographs and video recording.

We further conclude, contrary to Shipman's assertion, that the live line-up procedures were not unduly suggestive and did not taint the subsequent identifications of him. While the witnesses were waiting for the line-up to begin, one witness asked why there was a delay. Haas replied that either the defendant was not cooperating or they were having a hard time finding five other people that looked like the defendant. Haas may have referred to the suspect as "the individual" or "the guy," rather than "the defendant." However, regardless of which term Haas used, there is nothing in his statement, contrary to Shipman's assertion, that improperly suggested a consciousness of guilt on the part of one of the line-up participants or that the perpetrator of the instant offenses would be in the line-up. Furthermore, contrary to Shipman's assertion, the conduct of one witness, Thomas Schneider, did not make the live line-up unduly suggestive. While Shipman was stepping forward and speaking the phrase, "Give me the

11

money," Schneider raised his hand and held a card that he handed to an investigator. At an Evidence Code section 402 hearing, Deputy Public Defender Brianne Murphy testified that she observed Schneider's conduct and was aware Schneider behaved in that manner because he was having a hard time hearing and wanted Shipman to speak louder. However, it is unclear from the record and our independent viewing of the video recording of the live line-up whether any of the other witnesses observed Schneider's conduct.

In any event, assuming arguendo the other witnesses, including Lux, did observe it, there is nothing to show that any actions by law enforcement suggested Shipman or anyone else in the live line-up was a suspect in any of the instant offenses. Contrary to Shipman's assertion, our independent viewing of the video recording of the live line-up does not support a reasonable inference that Schneider's conduct was, in effect, Schneider saying "Bingo" or identifying Shipman as the man who committed his robbery. We conclude the identification procedures used during the live line-up were not unduly suggestive. *U.S. v. Crew* (1980) 445 U.S. 463, cited by Shipman, does not persuade us to conclude otherwise.

Assuming arguendo the identification procedures used with Lux were unduly suggestive, we nevertheless would conclude, based on our review of the totality of the circumstances, that Lux's identification of Shipman as the man who robbed him was reliable. Before Lux was robbed the first time, he had an extended period of time (20 to 25 minutes) during which to observe Shipman nearby in the parking lot. Lux conversed with Shipman and even handed him some matches. Therefore, Lux had ample

12

opportunity prior to the first robbery to observe Shipman and, when he was robbed a few hours later, recognized him from that earlier encounter. Lux's ability to identify Shipman was further enhanced when Shipman robbed him a second time two months later. During a 911 call, Lux stated that the man who robbed him was the same man who had robbed him before. Therefore, Lux clearly remembered the appearance of the man who robbed him the first time. When Lux ultimately identified Shipman as the man who robbed him after viewing the surveillance video recording and the subsequent live line-up, Lux had a strong foundation on which to identify him based on multiple opportunities to observe Shipman's appearance and mannerisms. Likewise, Lux's attention at the time of both robberies presumably was more than sufficient for him to remember Shipman's appearance. In particular, during the second robbery Lux recognized Shipman as the man who robbed him the first time. Furthermore, during the live line-up Lux identified Shipman "right away" and had "no doubt" he was the man who robbed him. Finally, the lapse of time between the two robberies and Lux's identification of Shipman was only a few months and therefore probably did not significantly affect his memory of the appearance of the man who robbed him twice. Under the totality of the circumstances, we conclude Lux's identification of Shipman as the man who robbed him was reliable. (*Cunningham*, *supra*, 25 Cal.4th at p. 989.) The admission of evidence of Lux's identification of Shipman did not violate Shipman's constitutional due process rights. (*Ibid.*)

*Fender.* Based on our review of the totality of the circumstances of the identification procedure used in showing Fender the three photographs of Shipman on the

13

flyer, we conclude that procedure was not unduly suggestive and did not taint her subsequent identifications of Shipman as the man who robbed her. Before showing Fender the photographs of Shipman, Haas told her that he had a video recording of a similar crime and wanted to show her photographs from the recording to see whether she could identify the man shown in the photographs as the man who robbed her. On viewing the photographs, Fender immediately identified Shipman as the man who robbed her. Although that identification procedure clearly was suggestive, we cannot conclude it was unduly suggestive. Although Fender was informed that the man shown in the photographs had committed a similar crime, she was not informed that he was believed to be the man who robbed her. Therefore, by showing the photographs of Shipman to Fender, Haas did not unduly suggest that he was the man who robbed her, but rather merely asked her to identify, based on her recollection, whether the man shown in the photographs was the man who robbed her.

Because the identification procedure used to show Fender the photographs of Shipman was not unduly suggestive, her subsequent identifications of Shipman could not be tainted by her prior viewing of those photographs. Neither Fender's identification of Shipman on viewing the video recording of the live line-up nor her identification of Shipman at trial was tainted by her prior viewing of the photographs of Shipman.

Furthermore, we reject Shipman's assertion that the procedure of showing Fender the video recording of the live line-up was itself unduly suggestive. Assuming arguendo that the recording included Haas's explanation for why there was a delay, we nevertheless conclude, as we did regarding Lux above, it was not unduly suggestive. Likewise, as we

14

concluded above regarding Lux, we conclude Fender's observation of a witness (i.e., Schneider) shown on the video recording holding up his hand and giving another man (i.e., an investigator) a card was not an unduly suggestive identification procedure.

In any event, assuming arguendo the identification procedures used with Fender were unduly suggestive, we nevertheless would conclude, based on our review of the totality of the circumstances, that her identification of Shipman as the man who robbed her was reliable. Before Fender was robbed, she had multiple opportunities to observe him. She testified that she had seen Shipman as a customer in the store between four and eight times and remembered him because each time he would buy a single piece of incense. When Shipman robbed her, Fender recognized him from her prior encounters with him in the store. When Fender positively identified Shipman as the man who robbed her after viewing the three photographs from the surveillance video recording and after viewing the video recording of the subsequent live line-up, she had a strong foundation on which to identify him based on multiple opportunities to observe Shipman's appearance and mannerisms. Likewise, Fender's attention at the time of the robbery presumably was more than sufficient for her to remember Shipman's appearance from those prior encounters as well as from the robbery. Finally, the lapse of time between the robbery and Fender's identification of Shipman was only two months and therefore probably did not significantly affect her memory of the appearance of the man who robbed her. Under the totality of the circumstances, we conclude Fender's identification of Shipman as the man who robbed her was reliable. (*Cunningham*, *supra*,

15

25 Cal.4th at p. 989.) Therefore, the admission of evidence of Fender's identification of Shipman did not violate Shipman's constitutional due process rights. (*Ibid.*)

II

*Shipman's Request for a Pinpoint Instruction*

Shipman contends the trial court erred by refusing to instruct with his pinpoint instruction that the pretrial identification procedures were unduly suggestive. He requested the trial court instruct the jury as follows:

> "The defendant contends that [Fender, Lux and another witness] mistakenly identified him because, among other factors, their initial identification of Mr. Shipman via the surveillance video was tainted by unduly suggestive police procedures.
>
> "*This Court has already determined that those three initial identifications were, in fact, tainted.* You should consider these initial identifications with caution and you may consider this when determining the accuracy of these witnesses' subsequent identifications.
>
> "If you have a reasonable doubt about whether or not these three witnesses' identification of Mr. Shipman as the perpetrator was accurate, you must find the defendant not guilty on those counts." (Italics added.)

The trial court refused to give that instruction, but nevertheless agreed to include the concept of suggestiveness of identification procedures by modifying CALCRIM No. 315, discussed below, to include as a factor in the jury's evaluation of identification testimony: "Were any of the identification procedures unduly suggestive?" We conclude, as the People assert, the trial court properly refused that pinpoint instruction because it was argumentative, inaccurate, and duplicative of other instructions.

16

A

Although a trial court must instruct on general principles of law relevant to the issues raised by the evidence (*People v. St. Martin* (1970) 1 Cal.3d 524, 531), the court must "refuse an argumentative instruction, that is, an instruction 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' " (*People v. Mincey* (1992) 2 Cal.4th 408, 437.) Likewise, although a criminal defendant "is entitled to an instruction that focuses the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1230), an instruction regarding the effects of such factors "is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate." (*People v. Wright* (1988) 45 Cal.3d 1126, 1143, fn. omitted.)

B

We conclude the trial court properly refused to instruct with Shipman's proposed pinpoint instruction. First, that proposed instruction was inaccurate because the trial court did *not*, as Shipman asserts, "determine" that the initial identifications by Lux and Fender "were, in fact, tainted." Rather, as we stated above, the court tentatively ruled only that it was "inclined" to grant Shipman's motion to exclude the pretrial identifications by Lux and Fender based on the single suspect photographs and surveillance video recording because the procedures used were "probably suggestive." It did *not* conclude those pretrial identifications were "tainted" or, alternatively stated, the result of unduly suggestive identification procedures.

17

Second, Shipman's proposed pinpoint instruction was argumentative because it invited the jury to draw inferences favorable to him from specific evidence. His proposed instruction argued, in effect, that because the trial court had found Lux's and Fender's initial identifications tainted, the jury should adopt his defense theory that Lux and Fender mistakenly identified him. Because the proposed pinpoint instruction was both inaccurate and argumentative, the trial court properly refused to give it.

Furthermore, Shipman has not carried his burden on appeal to show the trial court erred by modifying CALCRIM No. 315 to add the suggestiveness of identification procedures as a factor in the jury's evaluation of identification testimony (i.e., "[w]ere any of the identification procedures unduly suggestive?"). Although the term "unduly suggestive" is used, as discussed above, in a court's determination of the admissibility of identification evidence and therefore has a legal definition in that context, there is nothing in the court's modified version of CALCRIM No. 315 indicating, and Shipman does not persuade us, the jury needed to know and/or apply that legal definition of the term "unduly suggestive" in that context. Rather, the jury presumably applied the common lay meaning of that term, based on the expert testimony at trial regarding eyewitness identification, to the evidence in this case in evaluating the identification evidence and reaching its verdicts finding Shipman guilty on counts three, four and five.

## III

### *CALCRIM No. 315*

Shipman contends the trial court erred by instructing the jury with a version of CALCRIM No. 315 that included the certainty of the witness's identification as a factor in evaluating the accuracy of the identification.

### A

The trial court instructed with a version of CALCRIM No. 315 that stated in pertinent part:

> "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.
>
> "In evaluating identification testimony, consider the following questions: [¶] . . . [¶]
>
> "*How certain was the witness when he or she made an identification*?"  (Italics added.)

That "certainty factor" was one among 16 factors listed for the jury to consider in evaluating an eyewitness's identification testimony.  Shipman did not object to the court's instruction with that version of CALCRIM No. 315.

### B

Assuming arguendo that Shipman did not waive his contention by not objecting below to the trial court's instruction with CALCRIM No. 315, we nevertheless conclude the court properly instructed that a witness's certainty of his or her identification may be considered by the jury in evaluating that witness's identification testimony.  As Shipman notes, CALJIC No. 2.92, a predecessor to CALCRIM No. 315, was upheld in *People v.*

19

*Johnson, supra,* 3 Cal.4th at pages 1230 to 1232. (See also *People v. Wright*, *supra*, 45 Cal.3d at pp. 1141-1143 [approving CALJIC No. 2.92, which included the certainty factor at that time].) When *Johnson* was issued, CALJIC No. 2.92 included among the factors the jury should consider in evaluating eyewitness identification testimony " '[t]he extent to which the witness was either certain or uncertain of the identification.' " (*Johnson,* at pp. 1230-1231, fn. 12.) *Johnson* rejected the defendant's contention that the trial court erred in instructing the jury that the extent to which the witness was either certain or uncertain of the identification was a factor to consider in assessing eyewitness identification testimony. (*Id.* at pp. 1231-1232.)

Although Shipman correctly notes *Johnson* did not expressly address the question of whether inclusion of the certainty factor violated the federal and/or California Constitutions, we nevertheless presume the California Supreme Court would not have approved that instruction were it constitutionally infirm. Furthermore, other cases issued after *Johnson* have rejected the argument Shipman makes in this appeal. (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 561-562; *People v. Gaglione* (1994) 26 Cal.App.4th 1291, 1302-1303.) *Sullivan* stated: "As in *Gaglione*, we therefore 'reject defendant's arguments and find no error in CALJIC No. 2.92' as given with reference to degree of certainty as a factor in assessing the reliability of eyewitness identification testimony." (*Sullivan*, at p. 562.) We believe those cases' conclusions regarding the witness certainty factor in CALJIC No. 2.92 should likewise be applied to the trial court's instruction with CALCRIM No. 315 in this case. CALCRIM No. 315 does not require a jury to consider a witness's certainty or uncertainty. It does not make any correlation

20

between the witness's level of certainty and accuracy of his or her identification. It does not imply witnesses are more believable if they are certain of their identifications. Rather, CALCRIM No. 315 properly permits a jury to consider an eyewitness's certainty at the time of his or her identification. We conclude the trial court did not err by instructing that a witness's certainty of his or her identification may be considered by the jury in evaluating that witness's identification testimony.

Shipman has not cited any California case that held erroneous, whether as a violation of the federal and/or California Constitutions or otherwise, an instruction that witness certainty is a factor in the jury's evaluation of identification testimony. His citations to cases from other jurisdictions and psychology journal articles do not persuade us to reach a contrary conclusion. (See, e.g., *State v. Long* (Utah 1986) 721 P.2d 483; *Brodes v. State* (Ga. 2005) 614 S.E.2d 766.)

IV

*Ineffective Assistance of Counsel*

Shipman contends he was denied his constitutional right to effective assistance of counsel when his counsel did not object to the trial court's instruction with CALCRIM No. 315 that included witness certainty as a factor for the jury to consider in evaluating eyewitness identification testimony. However, because we concluded above that the court did not err by so instructing, his counsel's not objecting to that instruction cannot be prejudicial because it is not reasonably probable Shipman would have obtained a more favorable result had his counsel timely objected to that instruction. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687-694; *Cunningham*, *supra*, 25 Cal.4th at p. 1003.)

21

We conclude Shipman was not denied his constitutional right to effective assistance of counsel.

DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

McINTYRE, J.